[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 705 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 706 
Appellant, Jeffrey Todd Newsome, was convicted, after a jury trial, of the murder of Kimberly Tabatha Vaughn and was sentenced to life imprisonment. Ala. Code § 13A-6-2 (1975).[1] He appeals, raising 13 issues.
 I.
Appellant first contends that the state's evidence was insufficient to support his conviction. He preserved this issue for review by a motion for judgment of acquittal, which was made at the conclusion of the state's case-in-chief.
The evidence presented by the state in its case-in-chief disclosed that the victim, Kimberly Tabatha Vaughn, visited PJ's, a nightclub in Guntersville, on July 10, 1987. Upon arriving at the club, she parked her automobile on the street nearby and entered the club about 9:30 p.m. She spent the evening in the club with friends, danced, and had several drinks. Appellant apparently arrived at the club around midnight and was observed talking with the victim, in the club, around 1:00 a.m. on July 11, 1987. Appellant and the victim had known each other for several years. The victim left the club alone around 1:00 a.m. and was shortly thereafter observed standing on the sidewalk in front of the club as if she were waiting for someone. She was intoxicated. Shortly after 1:00 a.m., appellant was observed on the street near the club with a man and a woman. The three were engaged in an argument. The victim was never seen alive again. Her unlocked *Page 707 
automobile was discovered the following day parked near the club where she had left it the night before.
The investigation into the victim's disappearance commenced with the routine questioning of persons who had been seen with her or who may have seen her in the nightclub on the night of her disappearance. Appellant was routinely questioned on July 16, 1987, a few days after the victim's disappearance. During the interview, he became upset and belligerent; however, he gave the officers the following statement:
 "I was with Alan Weaver and Chris Scott, alias, Gumbie, that Friday night. I went to PJ's around eleven — around 10:30 or eleven. We left around 12:00 o'clock, I think. I really don't remember. Then I went to Sneads Crossroads to see Ricky Garrison. He wasn't home. I saw his sister. She's about fourteen or fifteen. Then I went to Gadsden to the Strip. I just cruised around. I don't remember what time I got home. Almost daylight. I talked to Kim when I was at PJ's. I really don't remember what about. Kim's not my type so I wasn't trying to hit on her. I parked my car across the street in front of PJ's.
 "I'm six foot and weigh a hundred and fifty-five pounds. I was wearing blue jeans and a white pull-over shirt."
On July 29, 1987, a search warrant was obtained to search appellant's automobile. He consented to accompany the officers to the police station for the search and, on the way, asked if the body of the victim had been found. During the search of appellant's automobile, the officers noticed that the interior roof lining of the automobile was sagging. The officers questioned appellant about the lining, and he stated that the lining was sagging because he had used mineral spirits to clean the interior of the automobile.
On August 3, 1987, the police learned that Mark McClearen had assisted appellant, early on the morning of July 11, 1987, in pulling his automobile from a place where it was stuck in an isolated area near Guntersville. Later that day, McClearen led the officers to the spot where he had assisted appellant in retrieving his vehicle. The place where appellant's vehicle had been stuck was on a steep, heavily wooded, rutted, trail used sometimes by three-wheel recreational vehicles, a considerable distance from a traveled road and in an area which could not be observed from a distance. Appellant's vehicle had struck a pine tree at the spot where it was stuck, and the damage to the tree was discernible to the officers.
A short time later on the same day, the unclothed remains of the victim were discovered within 50 yards of where appellant's vehicle had been stuck. Due to advanced decomposition of the body, the exact time and cause of death could not be determined. The remains consisted mainly of skin and bones. The internal organs had fully decomposed. Some of the deceased's bones were missing. The mandible, or lower jaw bone, and the second thoracic vertebra had become separated from the skeleton, and the hyoid bone[2] was missing. Dr. Joseph Embry, a forensic pathologist, testified that the missing hyoid bone was consistent with death by strangulation. An examination of the deceased's teeth disclosed that a frontal bridge, which encompassed three teeth, was missing. Dr. John B. Harrison, a dentist who had personal knowledge of the deceased's dental work, testified that, in his opinion, because the teeth of the bridge had been embedded in bone, its removal was consistent with "blunt force trauma" and that the possibility that an animal removed the bridge was "extremely remote." The hyoid bone, the dental bridge, and the deceased's clothing were never found. Her purse was found a considerable distance from the body. The victim's scalp and a portion of her skeleton were found 120 feet from the pine tree which had been struck by appellant's car. The officers concluded, *Page 708 
from their examination of the area, that the spot where the scalp and bones were found was the original location of the body and where the victim apparently had been killed. An automobile interior light was found at the scene, and a clothes hanger, which had been unfastened and straightened out, was found hanging in the pine tree.
McClearen testified that he asked appellant what he had been doing in that location, and that appellant told him that he "was over here partying with the Weavers . . . taking valium all night . . . and had gone down the trail to 'shit.' " McClearen further testified that appellant also told him that Alan Weaver had stolen his drugs and had left him down there stuck. Appellant told McClearen that he had spent the night near where he was stuck, and appellant retrieved an Army-type blanket from the side of the trail.
Alan Weaver and Chris Scott testified that they met appellant in Guntersville around 11:30 p.m., July 10, 1987, and rode around Guntersville with him, while drinking and smoking marijuana. They testified that appellant accused them of stealing marijuana from the glove compartment of his automobile. According to Weaver and Scott, appellant put them out at the "Jitney, Jr." store in Guntersville between 12:30 and 1:00 a.m., July 11, 1987, and told them that he was going to PJ's. They did not see him again that morning.
Lisa Richey, who was married to appellant at the time of the offense, testified that appellant left their apartment around 6:00 p.m., July 10, 1987; that he was dressed in an all-white short-sleeved shirt and blue jeans; and that she did not see him again until around 1:30 p.m., July 11, 1987, at their apartment. When she saw him on the 11th, he was dressed in camouflage pants, was nude from the waist up, and his chest, back, and arms had "red streaks" and "splotches," which he claimed was poison ivy. He explained to her that he had been to Gadsden and had driven around all night. He later explained the damage to his car door by telling his wife that Weaver and Scott had broken into his automobile and stolen his marijuana.
Shortly after appellant had been arrested for the murder of the victim and placed in the Guntersville jail, he had a conversation with another inmate, Johnny Thompson. Thompson testified that appellant told him that, on the night the victim died, he, a friend, and the victim "went riding around"; that the victim wanted to get "high"; that he gave her "crank"; that she died from an overdose of the drug; that he drove to where his automobile had become stuck; and that his friend took the victim's body out of the automobile. Thompson further testified that appellant told him that he worked in a cabinet shop and that, if he had been thinking right, he could have made a box and buried her and they never would have found the body. According to Thompson, appellant stated that he had seen the victim in the night club and had talked with her in the "parking lot."
Subsequently, appellant was incarcerated in the Talladega jail, where he had a conversation with fellow inmate Willis Richardson. Richardson testified that appellant told him that he was charged with murder and that he did not think he would get any time for it because "they didn't have sufficient evidence to convict him on the case as of yet." Richardson testified that, when appellant observed him reading the Bible, appellant asked if he could get forgiveness for murder. Richardson further testified that appellant told him that the only thing that looked bad for him was that "he was last seen with her," and that "they had, at some time, had a fight earlier before the murder took place at some parking lot." Richardson stated that, on one occasion after appellant had received a telephone call, appellant told him that he had talked with his folks and they told him that everything was looking good and that "[w]hatever you do, just stick to your story."
Cheri Smith, appellant's former girlfriend, testified that she dated appellant from the last of May to the first of August, 1986; that, in June of 1986, she visited in appellant's home; that while there, she engaged in a discussion about the victim with *Page 709 
appellant and his mother and sister; and that, when she and appellant left, they continued the discussion. The testimony at trial concerning this discussion is set out in the record, as follows:
 "Q. [Prosecuting Attorney]: After getting in the car, Cheri, I'll ask you if Mr. Newsome said anything to you?
"A. Yes, sir.
"Q. And what did he say first, if you recall?
 "A. He said he didn't like Kim, that she reminded him of somebody he hated.
"Q. Okay. And did you make any response to that?
"A. I said, 'Why?'
". . . .
"Q. What did he say?
 "A. He said that he had been drinking one night and him and Kim got to talking and he told her about Germany, and I said, 'So what? You told me.' And he said, 'No. I told her everything.'
 "Q. And when he said that to you, did you have any response to that?
"A. I told him that it was murder.
 "MR. HUBBARD [defense counsel]: Judge, we object —
MR. THOMPSON [prosecuting attorney] (Continued):
 "Q. Just — just a minute. He had just said he told her everything about Germany. What was said next?
 "A. He said that if he knew he could get away with it, he would take her off into the — somewhere where nobody would find — ever find her.
"Q. What did you say to that?
"A. I told him it was murder.
"Q. And what did he say to that?
 "A. He said that — he said that he didn't — that he believed everybody came back in another life, and — I said well — I said, 'You'll get caught,' and he said, 'No, I won't, not if I take her off somewhere nobody will ever find her.'
 "Q. Was there any more to that conversation, Cheri?
"A. No, sir."
To explain the conversation between appellant and Cheri Smith, in reference to appellant's involvement in something in Germany, the state presented James O'Brien, a criminal investigator with the United States Army, who testified that there was an "on-going" investigation of appellant in reference to the death of a German female, which occurred in February 1986, while appellant was stationed in Germany, and that investigators from Germany had been in the Marshall County area, questioning people in May and June 1986. For a better understanding of this matter, we quote the following from the record:
 "Q. During the course of being in the Huntsville office, I'll ask you if you've had an occasion to either be involved in the investigation or to become acquainted with one Jeffrey Todd Newsome?
 "A. Yes, sir. . . . I've been involved in the investigation.
". . . .
 "Q. If during the period of 1986, Mr. Newsome had made a statement that he had told someone about 'everything about Germany,' would you know anything that he had been involved in in Germany that he might be referring to?
"A. Yes, I would.
 "Q. And were you, in fact, during that time, or was your office, in fact, during that time investigating Mr. Newsome?
"A. Yes, sir, we were assisting agents in Germany.
". . . .
 "Q. From your file have you determined in the early part of 1986 whether there has been any investigation in this area of Marshall County concerning the questioning of anyone here concerning this matter?
". . . .
 "A. In May or June, agents from Germany came over here.
". . . .
 "Q. Agent O'Brien, during the early part of 1986, May — during that time frame the investigation that you say you were conducting, being conducted by your office on Mr. Jeffrey Todd Newsome, what was that concerning? *Page 710 
 "A. Pertaining to the death of a German female in March.
"Q. Is that an on-going case?
"A. Yes, it is.
"Q. Is it still open?
"A. Yes, it is."
In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied,387 So.2d 283 (Ala. 1980); McBryar v. State, 368 So.2d 568
(Ala.Cr.App.), cert. denied, 368 So.2d 575 (Ala. 1979); 7 Ala. Digest, Criminal Law, Key No. 1159.3. The action of the trial court in denying a motion for judgment of acquittal must be reviewed by determining whether there exists legal evidence before the jury, at the time the motion is made, from which the jury by fair inference could find the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App. 1983); Thomas v. State, 363 So.2d 1020 (Ala.Cr.App. 1978).
A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. Chafin v. State,333 So.2d 599 (Ala.Cr.App.), cert. denied, 333 So.2d 609 (Ala. 1976). As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. Agee v. State, 470 So.2d 1331 (Ala.Cr.App. 1985). In reviewing a conviction based on circumstantial evidence, "[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Cumbo v. State,368 So.2d at 874.
Appellant contends, in his brief, that the state failed to prove the corpus delicti of the crime charged. To prove the corpus delicti, the state was required to prove the death of the victim and that her death was caused by the criminal agency of another. Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), cert. quashed, 378 So.2d 1173 (Ala. 1979). To prove the corpus delicti, it is not necessary to prove that the victim's death was occasioned by the criminal agency of the defendant. Johnsonv. State; James v. State, 339 So.2d 1047 (Ala.Cr.App.), cert. denied, 339 So.2d 1052 (Ala. 1976). Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury. Cumbo v. State;Robinson v. State, 528 So.2d 343 (Ala.Cr.App. 1986); Hopson v.State, 352 So.2d 500 (Ala.Cr.App. 1976), aff'd, 352 So.2d 506
(Ala. 1977). Here, the remains were positively identified, through dental evidence, as being those of Kimberly Tabatha Vaughn. Her remains were found in an isolated, rural, and almost inaccessible area. Her clothing was missing and was never found. Her purse was found some distance from her remains. When last seen alive, she obviously was in reasonably good health. Her automobile remained parked at the nightclub where she was last seen. The victim's hyoid bone, which is located in the throat, was missing, indicating possible strangulation. A dental bridge was missing from her mouth and was never found. The removal of the bridge would have required blunt force trauma. The separating of the mandible and the second thoracic vertebra also indicated trauma. From this evidence, the jury could have reasonably inferred that the death of the victim was caused by the criminal agency of another. Under these facts, it would be highly illogical to conclude otherwise. The state proved the corpus delicti.
In the instant case, we have examined the evidence presented by the state and, in so doing, have applied the standards of review set out above. The state's evidence *Page 711 
is almost entirely circumstantial; however, as we have pointed out, guilt may be established by circumstantial evidence as well as by direct evidence. Appellant was observed talking with the victim around 1:00 a.m., inside the nightclub. Around 1:00 a.m., the victim left the club and was observed standing on the sidewalk in front of the club, acting as if she were waiting on someone. Shortly after 1:00 a.m., appellant was observed in front of the club, where automobiles were parked, engaged in an argument with a woman and a man. Appellant told inmate Thompson that he had seen the victim at the club and had talked with her in the parking lot. He told inmate Richardson that he was the last person seen with the victim and had had a fight with her in a parking lot before the murder. From these facts, it could be reasonably inferred that appellant was engaged in an argument with the victim outside the club in the automobile parking area a short time after 1:00 a.m. and shortly before the victim's disappearance. Sometime between 1:00 a.m. and 6:00 a.m., appellant drove his automobile to an isolated rural area, where it became stuck. He was observed around 6:00 a.m. seeking help to retrieve his automobile. The remains of the victim were discovered about three weeks later less than 50 yards from where appellant's automobile had been stuck. It could be reasonably inferred from the evidence that the body of the victim had been in the location where it was found since the night of her disappearance.
Appellant's statements and explanations are incriminating. His statement to the police six days after the victim's disappearance did not reveal that his vehicle had been stuck, but he told them instead that he had been to Gadsden and was "cruising around." His explanation to McClearen as to why he was in the area where his vehicle was stuck conflicted with the testimony of Weaver and Scott. He failed to tell his wife that he had been stuck, but told her that he had been to Gadsden and had driven around all night. He gave her a false reason for the damage to his vehicle. She observed that his body was covered with red splotches. On July 29, prior to the discovery of the victim's remains and while her disappearance was still being handled as a missing person case, appellant asked officers if they had found the victim's body yet. He told jail inmate Thompson that, if he had been thinking right, he could have disposed of the body where no one would have ever found it. He told inmate Richardson that the authorities did not have enough evidence on him "as of yet," and asked him if he could be forgiven for murder.
Finally, Cheri Smith, a former girlfriend, and James O'Brien, an Army investigator testified about a possible motive for the crime. Appellant was the subject of an investigation into the death of a German girl. The investigation had continued after appellant had returned to the United States, and Army investigators had been in Marshall County interviewing witnesses.[3] He had told the victim "everything" about his problems in Germany, and he expressed a desire to take the victim off and dispose of her where no one could ever find her.
In summary, appellant was seen arguing with the victim about the time of her disappearance; he drove his automobile to a point where it became stuck a short time later, within 50 yards of where the victim's body was eventually discovered, in an isolated area; he gave false, misleading and incriminating statements concerning his whereabouts, his actions, and his desire to dispose of the victim; and he had a motive for killing her. The evidence presented by the state, along with reasonable and fair inferences to be drawn from it, was sufficient, in our opinion, for the jury to exclude every reasonable hypothesis except that of guilt beyond a reasonable doubt. The trial court's denial of appellant's motion for judgment of acquittal was correct. The state's evidence established a prima facie *Page 712 
case, and the case was properly submitted to the jury.
 II.
Appellant next contends that the trial court committed reversible error in denying his motion for a mistrial based on alleged comments made by venirepersons during jury selection.
After the trial jury had been selected and before commencement of the trial, venire-person Martha Rice, who had been struck peremptorily during the selection process, told the trial judge that she had heard some remarks, concerning the case, made by members of the venire, and said she felt compelled to report them. The trial judge called the prosecutor and defense counsel into chambers to discuss the matter and to decide what to do. They decided to call Mrs. Rice into chambers and question her about what she had heard. Mrs. Rice testified that Helen White, who had been selected to serve on the trial jury as an alternate, had stated the following to her, during the voir dire examination: "That boy is guilty. He killed that girl." She further testified that Mrs. White had said that "it was brought out as evidence in the first trial that he had murdered a girl in Germany." Mrs. Rice also testified that venireperson Mary Howe, who was excused from the venire, stated, during the voir dire, that "somebody had made the statement that he might not even remember killing the girl if he'd gone into the other personality." Mrs. Howe was called in and testified that she had stated, in the presence of Dorothy Lyon, a person selected to serve on the jury, and others, who were excused from the venire, that "my neighbor is convinced that he had a split personality." These proceedings were reported and are part of the record.
After questioning Mrs. Rice and Mrs. Howe, the trial court and counsel for the parties decided to call in all persons selected to serve on the trial jury and question them as to what they had heard. At that point, the trial court suggested that appellant should be brought in and be present during the questioning of the jurors. He had not been present during the questioning of Mrs. Rice and Mrs. Howe; however, no objection was made to his absence.
Each of the jurors selected to try the case was individually called into chambers and questioned by the court and counsel. Each denied hearing any comments about the case, and each reiterated that he or she could give appellant a fair trial and base a decision solely on the evidence presented during the trial. Mrs. Lyon denied hearing any statement from Mrs. Howe concerning the case, but did remember talking with her about matters unrelated to the case. Mrs. White testified that she had not made up her mind about the case, that she believed the defendant to be innocent until proven guilty beyond a reasonable doubt, and that she could give him a fair trial. She testified that she did not hear Mrs. Howe say anything. In reference to any contact with Mrs. Rice, Mrs. White testified as follows:
"THE COURT: Were you seated close to Mrs. Rice?
"MRS. WHITE: Yes. . . . She was next to me.
 "THE COURT: She was having a problem with the case. I think she may have asked about the death penalty, or something like that. Did she say anything about the case at all?
"MRS. WHITE: No. She was a real honest —
"THE COURT: She really is.
 "MRS. WHITE: — and she kept everything to herself, and she didn't want anybody to discuss the case whatsoever.
 "THE COURT: Did anyone in that group, either in the courtroom or outside the courtroom, attempt to discuss the case in your presence or in your hearing?
"MRS. WHITE: No, sir.
 "THE COURT: Now, when Mrs. Rice — when you say she didn't want anybody to discuss the case, did she have to tell someone not to discuss the case?
 "MRS. WHITE: No. Do you want me to tell you what she said?
"THE COURT: Yes, ma'am, I sure do.
 "MRS. WHITE: She said, 'Did you hear what she said? They ought not be allowed *Page 713 
to talk about that in here.' I told her I had my mind on what the Judge was saying and I didn't hear a word, and she said, 'Well, I did, and I want to tell the Judge to tell people not to be talking about it.' But I didn't hear a word.
"THE COURT: But you didn't hear it?
"MRS. WHITE: Uh-uh (indicating no).
"THE COURT: Okay. Very good.
"MRS. WHITE: . . . I was listening to you.
 "THE COURT: Well, I appreciate you listening to me.
". . . .
 "THE COURT: Mr. Thompson [prosecuting attorney], do you have any questions to ask?
"MR. THOMPSON: No, sir.
 "THE COURT: Mr. Hubbard [defense counsel], do you want to ask Mrs. White any questions?
 "MR. HUBBARD: . . . do you know who Mrs. Rice was referring to when she said to you, 'They ought not to be doing that'?
 "MRS. WHITE: Well, I don't know exactly who, but it was the ones that was right behind us.
 "MR. HUBBARD: Do you know who they were, please, ma'am?
 "MRS. WHITE: I do know that Mrs. Howe was sitting behind us.
 "MR. HUBBARD: And do you know anyone else that was right in that area?
 "MRS. WHITE: Well, I can't remember their names. One was an older woman; she was trying to get off; Glassco, I believe, was her name.
"MR. HUBBARD: Anybody else?
 "MRS. WHITE: That was the two that was right behind us.
"MR. HUBBARD: Can you think of anyone else?
"MRS. WHITE: No, sir.
 "MR. HUBBARD: Did Mrs. Rice comment about they ought not to be doing that more than one time, Mrs. White?
"MRS. WHITE: No, sir.
"MR. HUBBARD: Just the one time?
 "MRS. WHITE: Yes. That was while we was eating lunch.
"MR. HUBBARD: Y'all had lunch together?
 "MRS. WHITE: Yes. That's when she asked if I heard anything. And then she said, 'We might not supposed to be talking about this.' And then we didn't mention it anymore.
"MR. HUBBARD: Where did you have lunch?
 "MRS. WHITE: We sat at the same table at Mr. C's. There was a lot of people in there.
 "MR. HUBBARD: Oh, I see. But she was referring to what had been discussed in the courtroom, wasn't she?
"MRS. WHITE: Yes.
 "MR. HUBBARD: About what was being discussed in the restaurant?
"MRS. WHITE: Oh, yeah.
 "MR. HUBBARD: I assume you told Mrs. Rice you hadn't heard anything.
 "MRS. WHITE: I said, 'I didn't hear a thing.' And she said, 'Well, I wish I hadn't.' "
We have reviewed the record of these proceedings, and based on the record, we find no fault with the finding of the trial court that the jury selected to try the case was able to do so in an impartial and unbiased manner. Mrs. Rice had difficulty remembering the details, she appeared to be confused about what was said and to whom, and her testimony conflicted with testimony of other jurors. Considering the state of this testimony, in light of the jurors' strong assertion that they could render a fair and just verdict, we hold that the trial court's decision was reasonably based on the testimony as a whole and, thus, we will not disturb its decision. We further note that the trial court, while not finding that Mrs. Howe's comment was not prejudicial, found that the comment was not overheard by any juror selected to try the case, but was made to two venirepersons who were not selected to serve on the jury. Moreover, we find that, while Mrs. White was not specifically asked, by the trial court or defense counsel, whether she made the comments attributed to her by Mrs. Rice, the trial court could have reasonably concluded, from the testimony, *Page 714 
that she did not make any such remarks. Her testimony was inconsistent with having made such comments. Finally, the record reveals that Mrs. White, an alternate, was excused prior to the deliberations of the jury.
The decision of whether to grant a mistrial is a matter largely within the discretion of the trial court, and the decision rests largely upon the issues and particular circumstances of each case. Wysinger v. State, 448 So.2d 435
(Ala.Cr.App. 1983). The trial court's determination will not be reversed on appeal absent a clear showing of abuse of discretion by the trial court. Saffold v. State, 494 So.2d 164
(Ala.Cr.App. 1986). We find no abuse of discretion here. The denial of the motion for a mistrial was proper.
 III.
Appellant next contends that the trial court improperly limited his cross-examination of prosecution witness Kevin Smith. Smith had testified, on direct examination, that he saw appellant around 1:00 a.m., July 11, 1987, in PJ's, talking with a female, who in his "best judgment" was the victim, Kim Tabatha Vaughn. He testified, on cross-examination, that he made a statement to Investigator Bob Norwood to this effect shortly after the victim's disappearance on July 25, 1987, and that in that statement, he stated that it was his "best judgment" that the female he saw talking with appellant was the victim. He also testified that, on August 29, 1987, he gave Norwood another statement in which he stated that the female he saw was the victim "to the best of my knowledge." After Smith testified, in essence, on two occasions during cross-examination that he was not "100%" sure of his identification, defense counsel asked, "Finally, I want to ask you this: You can't be sure, 100% positive, about anything you said in either one of those statements, can you, Kevin?" The trial court sustained the prosecutor's objection to the question on the ground that it was repetitious.
Appellant argues that the question applied to all facets of Smith's testimony, not just to his identification of the girl, and that the ruling of the trial court prevented him from cross-examining Smith on his other testimony.
"The control of cross-examination is within the discretion of the trial judge after a party has had an opportunity to substantially exercise his right of cross-examination."Bell v. State, 385 So.2d 78 (Ala.Cr.App. 1980). The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating. Atwell v. State,354 So.2d 30 (Ala.Cr.App. 1977), cert. denied, 354 So.2d 39 (Ala. 1978).
While the question was general and could be interpreted as applying to all the testimony, the trial court apparently interpreted it as applying to Smith's identification of the victim. If the question was directed to the identification of the victim, the question was indeed repetitious and objectionable. However, even if the question applied to all the witness's testimony and statements, as appellant argues, we still do not find error here. Our review of the entire testimony of Smith convinces us that the cross-examination was not improperly limited by the trial court. On the contrary, the cross-examination was sifting and thorough. Every facet of the direct testimony, as well as of the pretrial statements, was explored. The cross-examination was wide ranging and substantial. Every fact which could call into question the accuracy of Smith's recollections and observations was brought out. We find no abuse of the trial court's discretion in sustaining the prosecution's objection.
 IV.
Appellant next contends that the trial court erred in overruling his objection to the admission of testimony from his former wife, Lisa Rickey, concerning a discussion she and appellant had on July 8, two days prior to the victim's disappearance, about appellant's wanting a divorce. The record shows the following: *Page 715 
 "Q. [Prosecuting attorney]: Lisa, I'd like to take you back to the Wednesday night before Friday night on July the 10th, and ask on that particular occasion, if you and Jeff were both at home at your apartment at any part of that evening?
 "A. Yes, sir. I came home from work and Jeff didn't come home till — it was after midnight.
 "Q. Did you and Jeff have any discussion that evening regarding your marital status?
 "A. Yes, sir. When he came home, he told me that he had been thinking and that he wanted —
 "MR. HUBBARD [defense counsel]: Excuse me. What time are we talking about?
 "MR. THOMPSON [prosecuting attorney]: Wednesday evening after midnight.
 "THE COURT: Be about July the 8th, I would assume.
"MR. THOMPSON: That's correct.
"THE COURT: July the 8th.
 "MR. HUBBARD: July the 8th? Well, Your Honor, we are going to object to this not being relevant or material to the issues in this case.
"THE COURT: Overruled. Go ahead.
"(Mr. Thompson, Continued):
 "Q. Go ahead. Did you have any discussion regarding your marital, marital status that evening, that night?
 "A. He told me that he had been thinking and that he wanted a divorce.
"Q. Was this all that was said?
 "A. I asked him who he had been with, who he had been talking to about it and he said nobody, that he just didn't want to be married.
 "Q. Now, was it discussed just very briefly that evening or for some prolonged period of time?
"A. Just very briefly."
Evidence is relevant if of any probative value, however slight. Primm v. State, 473 So.2d 1149 (Ala.Cr.App. 1985); C. Gamble, McElroy's Alabama Evidence § 21.01(1) (3d ed. 1977). The determination of relevancy is within the discretion of the trial court, and such a determination will not be reversed absent a clear showing of abuse of discretion. Bryan v. State,453 So.2d 765 (Ala.Cr.App. 1984).
We believe that the fact that appellant was contemplating a divorce, during the period immediately preceding the disappearance of the victim, has probative value in that it shed light on appellant's state of mind at the time of the murder and helped explain his behavior. We find no abuse of the trial court's discretion in admitting this testimony, as it was relevant and material to important issues in the case.
 V.
Appellant contends that the trial court erred in sustaining the state's objection to the following question asked of prosecution witness Joni Phillips by defense counsel on cross-examination: "If you had seen a side profile of the defendant in a crowd of several men in broad open daylight, you couldn't have picked him out could you?" A hypothetical statement of facts is not an allowable basis for the opinion of a non-expert. Honeywell, Inc. v. Bel Air Corp., 518 So.2d 100
(Ala. 1987); Ragland v. State, 125 Ala. 12, 26, 27 So. 983, 986
(1899); Grissom v. State, 33 Ala. App. 23, 30 So.2d 19, cert. denied, 249 Ala. 125, 30 So.2d 26 (1947). The trial court properly refused to allow Phillips, a non-expert, to answer appellant's hypothetical question.
 VI.
Appellant contends that the state failed to prove the corpus delicti of the crime of murder, for which he was indicted and convicted. We have thoroughly addressed this contention in part I and have concluded that, although the evidence presented to prove the corpus delicti was circumstantial, it was sufficient for the jury to reasonably infer that the crime had been committed. Appellant also, under this contention, raises the question again of the sufficiency of the evidence to support his conviction. We have addressed this issue in part I and *Page 716 
have held adversely to appellant. We deem further discussion unnecessary.
 VII.
In part VII of appellant's brief, he raises several matters which he claims were violations of his constitutional rights. He contends that there was a lack of probable cause for the issuance of the search warrant to search his automobile. He claims that Phillips's identification of him as the person she saw engaged in an argument with the victim outside of PJ's around 1:00 a.m., on July 11, 1987, was tainted because of an unduly suggestive showup and her hypnotic session. The attorney general correctly points out that these matters were not raised in the trial court and are urged for the first time on appeal. Appellant concedes this in his brief. Review on appeal is limited to review of questions properly and timely raised at trial. Biddie v. State, 516 So.2d 846 (Ala. 1987); Dixon v.State, 476 So.2d 1236 (Ala.Cr.App.), cert. denied,476 So.2d 1236 (Ala. 1985). Absent a timely objection or motion to suppress at trial, this court may not consider these issues on appeal.
 VIII.
Appellant next contends that the trial court committed reversible error in admitting evidence of a collateral crime. The evidence to which appellant is referring is the testimony of a state's witness, Cheri Smith, that appellant had previously told her that he had told the victim, Kim Vaughn, "everything about Germany" and that, if he could get away with it, he would take her off where nobody could find her. He also refers to testimony of James O'Brien, a criminal investigator with the United States Army, who testified that appellant was a prime suspect in the death of a German girl in Germany, that the investigation was "ongoing," and that investigators had questioned witnesses pertaining to the case in Marshall County prior to the disappearance of the victim in this case.
The general rule is that evidence of other or collateral crimes is not admissible as substantive evidence to establish the guilt of the accused of a particular crime, but, as with most broad general rules, numerous exceptions have been developed. Twilley v. State, 472 So.2d 1130 (Ala.Cr.App. 1985). For a history and discussion of these exceptions, see Nelson v.State, 511 So.2d 225 (Ala.Cr.App. 1986), aff'd, 511 So.2d 248
(Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755,100 L.Ed.2d 217 (1988), and C. Gamble, McElroy's Alabama Evidence § 69.01(1)-(11) (3d ed. 1977). While the general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character or an inclination or propensity to commit the type of crime for which the accused stands charged, where the commission of another crime or misdeed is an element of guilt or otherwise tends to prove his guilt, then proof of such other crime or misdeed is admissible. Nelson v. State; C. Gamble, supra, at § 69.01(1).
One well-recognized exception to the general exclusionary rule is relevancy to prove motive. The motive element for a homicide may take many forms; it may include the purpose of the homicide. C. Gamble, supra, at § 70.01(12)(e). Whenever evidence of a crime is relevant to prove the motive for the now-charged homicide, it is admissible. Id. The state may prove the accused's commission of a previous crime if the evidence warrants a reasonable inference that he committed the now-charged homicide for the purpose of escaping arrest and conviction for the previous crime. Nelson v. State; C. Gamble, supra, at § 70.01(12)(e).
We conclude, after careful review, that the admission of the testimony of Smith and O'Brien concerning appellant's statement about the victim and his problems in Germany and the "ongoing" investigation into the death of the German girl was justified as a circumstance tending to show a motive for the killing of Vaughn. This evidence warrants a reasonable inference that the killing of Vaughn was to prevent detection, arrest, and ultimate prosecution for the killing of the German girl. *Page 717 
Appellant argues that, even if the evidence is relevant, its probative value is outweighed by its prejudicial effect. We do not agree. We find that the evidence was reasonably necessary to the state's case, that it was not unduly and unfairly prejudicial, and that its probative value in explaining the statement of appellant concerning the victim and in establishing a motive for the crime outweighed any potential prejudice. See Averette v. State, 469 So.2d 1371 (Ala.Cr.App. 1985), and Robinson v. State, 528 So.2d 343 (Ala.Cr.App. 1986). Appellant also urges, in his brief, that there was no evidence to connect him with the collateral crime. In doing so, he completely ignores his statement to Smith about telling the victim "everything about Germany" and expressing a desire that she disappear. By his own statement, he connected himself with the German affair.
 IX.
Appellant contends that Joni Phillips's identification of him as one of the persons standing in front of PJ's shortly after 1:00 a.m., July 11, 1987, was erroneously admitted into evidence because it had been induced by hypnosis.
Appellant argues that Phillips's hypnotically enhanced testimony should not have been admitted because, he argues, the state "failed to lay a predicate assuring the reliability of the procedure and the result." He argues that, pursuant toPrewitt v. State, 460 So.2d 296 (Ala.Cr.App. 1984), admissibility of hypnosis-related evidence requires laying a predicate under the test of Frye v. United States, 293 F. 1013
(D.C. Cir. 1923).
We note at the outset that no objection was made by appellant to the hypnotically enhanced testimony of Phillips during the time that she was on the witness stand. In fact, no objection was made to the hypnotically enhanced testimony until all the evidence had been received and both sides had rested. In his motion for judgment of acquittal made at the close of all the evidence, appellant raised, for the first time, the failure of the state to lay a Frye predicate for the admission of the hypnotically enhanced testimony. The motion was denied by the trial court.
Review on appeal is restricted to questions and issues properly and timely raised at trial. Dixon v. State,476 So.2d 1236 (Ala.Cr.App. 1985). A motion to exclude or a motion for a new trial or a motion for a judgment of acquittal is not sufficient to preserve the issue where no timely objection was made at the time the evidence was offered and admitted. Fisherv. State, 439 So.2d 176 (Ala.Cr.App. 1983); Coon v. State,432 So.2d 558 (Ala.Cr.App. 1983). No timely objection having been made to the admission of the testimony, the overruling of the motion for judgment of acquittal by the trial court was proper.
 X.
Appellant contends that he was deprived of his due process rights because the assistant district attorney had previously been his retained counsel. The assistant district attorney, Timothy Jolly, assisted the district attorney, Ronald Thompson, in the prosecution of this case. Jolly also assisted in the prosecution of the first trial, which resulted in a mistrial. Prior to becoming an assistant district attorney, Jolly had represented appellant in matters relating to the investigation into the death of a woman in Germany, which occurred while appellant was stationed in that country. No charge had been brought against appellant at the time and, indeed, as far as this court knows, none has ever been brought.
The record shows that appellant, with advice of competent counsel, waived any disqualification or conflict that might have existed and consented to Jolly's participation in the prosecution of the case. Further, the evidence presented at trial pertaining to the German affair did not come from Jolly, but was provided by appellant's former girlfriend, Cheri Smith, who informed the prosecutors within two weeks of the commencement of the instant trial of the earlier statement of appellant which tended to prove a motive for the crime. The investigation into the death of the German woman and its focus on appellant *Page 718 
were matters of common knowledge. Referring to his representation of appellant, Jolly stated the following to the trial judge: "Mr. Newsome never told me anything that would incriminate him concerning that incident. Absolutely exculpatory evidence in that case so far as what he told me." Furthermore, Cheri Smith's testimony was given without objection from appellant.
We find no merit in this contention.
 XI.
Appellant contends that his constitutional rights were violated by his absence from an in camera hearing wherein the trial court inquired into possible juror bias, which we have previously discussed in part II, above. After the jury had been selected and before any evidence had been presented, the trial court was notified that certain statements may have been made in the presence of members of the trial jury that could be prejudicial to appellant. The trial judge met in chambers with counsel for the parties. One person who overheard the remarks and one person reported to have made a remark were questioned. This questioning was transcribed by a court reporter. No mention was made of appellant's absence from this discussion until the trial judge decided that the jurors selected to try the case would be questioned individually as to what they may have heard. The trial court then stated that appellant should be present, and he was present during the individual questioning of the jurors.
In United States v. Gagnon, 470 U.S. 522, 105 S.Ct. 1482,84 L.Ed.2d 486 (1985), the Court, in holding that the due process guarantees were not violated by the four defendants' absence from an in camera hearing attended by one defendant's counsel and a juror to assess a juror's concern about the defendant's sketching portraits of the jury, observed the following:
 "[T]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication."
Id. at 526, 105 S.Ct. at 1484 (quoting Rushen v. Spain,464 U.S. 114, 125-26, 104 S.Ct. 453, 459, 78 L.Ed.2d 267 (1983) (Stevens, J., concurring in judgment)). After noting that the Court in Snyder v. Massachusetts, 291 U.S. 97, 115,54 S.Ct. 330, 335, 78 L.Ed. 674 (1934), cautioned that the defendant's absence should be considered in light of the whole record, the Court held that "the presence of the four respondents and their four trial counsel at the in camera discussion was not required to ensure fundamental fairness or a 'reasonably substantial . . . opportunity to defend against the charge.' " 470 U.S. at 527,105 S.Ct. at 1484 (quoting Snyder, 291 U.S. at 105-06,54 S.Ct. at 332). In so holding, the Court noted, among other things, that the encounter between the court, the juror, and one defense counsel at the in camera hearing was a "short interlude in a complex trial"; that the hearing was not "the sort of event which every defendant had a right personally to attend under the Fifth Amendment"; and that the defendants could have done nothing or gained nothing had they been present.470 U.S. at 527, 105 S.Ct. at 1484. We find these considerations to be present in the instant case and hold that appellant has failed to establish the presence of a constitutional deprivation. His presence was not required to ensure fundamental fairness and, certainly, the context of the hearing offered nothing to defend against the charge. See also Kentucky v. Stincer, 482 U.S. 730,745-47, 107 S.Ct. 2658, 2667-2668, 96 L.Ed.2d 631 (1987);United States v. Boone, 759 F.2d 345, 347 (4th Cir. 1985), cert. denied, 474 U.S. 861, 106 S.Ct. 176, 88 L.Ed.2d 146
(1985).
We note that no contemporaneous objection was made to the absence of appellant during this in-chambers proceeding which led to the decision to question each member of the trial jury. The proceeding was nothing more than an effort by the court and the attorneys to ascertain what the venirepersons had heard and to decide what to do. Once the decision had been made, appellant was brought in, and the questioning of the jurors elicited essentially *Page 719 
everything that had been discussed in chambers in his absence. It is apparent that, at the time, no one, including defense counsel, gave any thought or placed any importance on appellant's absence. Moreover, this issue was not raised in appellant's motion for new trial. Thus, appellant has waived any claim of error. See United States v. Brown, 571 F.2d 980,987 (6th Cir. 1978).
 XII.
Appellant next contends that error occurred when the court overruled his motion for a change of venue. We do not agree. Appellant wholly failed to meet his burden of showing that pre-trial publicity had created actual prejudice by the jury or a pervasive hostility within the community. See Sparks v.State, 450 So.2d 188 (Ala.Cr.App. 1984). No abuse of the trial court's discretion in denying the motion has been demonstrated. Its decision was correct.
 XIII.
Appellant contends that the trial court erred in denying his motion for a mistrial because of the state pathologist's testimony that the manner of death of the victim was homicide. Appellant also objected to this conclusion by the pathologist and moved to exclude it. His objection was sustained by the trial court, the answer was excluded, and the jury was instructed to disregard it. In addition, the jury was polled to determine if any juror would have difficulty following the court's instructions. All indicated by their silence that they could follow the court's instructions. We find the response of the trial court to be appropriate under these circumstances, and the denial of the motion for a mistrial was proper.
For the reasons stated above, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] The indictment in this case contains two counts, which are practically identical, charging identical offenses of murder. This is the second trial of this case. A mistrial was declared in the first trial when the jury was unable to reach a verdict.
[2] "Designating, or pertaining to, a bone or several connected bones situated at the base of the tongue and developed from the second and third visceral arches." Websters New InternationalDictionary, G. C. Merriam Company, Publishers, Springfield, Mass. (2d ed. 1935), p. 1224.
[3] Appellant had employed counsel to represent him in the matters pertaining to the investigation and possible extradition.