Joseph Hawkins was indicted for the offense of murder in violation of § 13A-6-2, Code of Alabama 1975. The jury found Hawkins guilty as charged in the indictment, and he was sentenced to 25 years in *Page 183 
the penitentiary and was ordered to pay a fine of $2,000. Six issues are raised on appeal.
 I
Hawkins contends that the trial court erred in denying his motion to suppress the statement he made to the police because (1) he had an epileptic seizure during the interview and (2) he was the victim of an active deception by the interrogating officer, who allegedly led Hawkins to believe that the victim was alive when the officer knew that the victim was dead.
The determination of the voluntariness of a confession is within the sound discretion of the trial court, and its finding will not be disturbed on appeal unless found to be manifestly contrary to the great weight of the evidence. Gilder v. State,542 So.2d 1306 (Ala.Cr.App. 1988), cert. denied, (Ala. 1989);Malone v. State, 452 So.2d 1386, 1389 (Ala.Cr.App. 1984). Before a confession is admissible, the State must show that the statement was voluntary and that a Miranda predicate was laid.Paulk v. State, 473 So.2d 666 (Ala.Cr.App. 1985). " '[A] confession is not inadmissible merely because it was induced by a trick or misrepresentation which was not reasonably calculated to lead the accused to confess falsely.' " Gilder v.State, supra, 542 So.2d at 1308 (quoting C. Gamble, McElroy'sAlabama Evidence, § 200.07(7) at p. 553 (4th ed. 1991)).
At the suppression hearing, Officer Steve Robertson of the Anniston Police Department testified that before interviewing Hawkins he talked to Hawkins to determine his physical condition and determined that Hawkins was sober and that Hawkins could talk to him. Before interviewing Hawkins, Robertson advised him of his Miranda rights. Robertson then asked Hawkins if he understood these rights, and Hawkins answered in the affirmative. It appeared to Robertson that Hawkins read his rights again before signing the waiver of rights form. At the top of the waiver of rights form, Robertson had written "homicide" as the type of case. Robertson testified that Hawkins appeared to understand his rights and that Hawkins did not appear to be suffering from any condition that would hamper his ability to talk. Robertson also testified that neither he nor anyone in his presence threatened, coerced, or intimidated Hawkins or promised Hawkins any reward for making a statement. After Hawkins signed the waiver of rights form, he gave a statement to Robertson.
Robertson further testified that during the statement there was nothing about Hawkins's appearance which indicated that Hawkins was in any discomfort or that he was ill. According to Robertson, Hawkins was in control of his faculties and knew what was going on when he gave his statement. Robertson further testified that, although he did not advise Hawkins of the victim's death before taking the statement, Hawkins never asked Robertson about the victim's condition and Robertson did not intentionally give Hawkins the impression that he was facing a less serious charge than murder.
It is clear from Robertson's testimony that the State established, prior to the statement's being admitted into evidence, that the Miranda predicate was laid and that the statement was voluntarily made. Although Hawkins presented some testimony to the contrary, where the trial court finds that a statement was voluntarily made, its findings should not be disturbed on appeal unless found to be manifestly contrary to the evidence. The trial court's determination that Hawkins's statement was voluntarily made is clearly not contrary to the evidence in this case.
 II
Hawkins contends that the evidence, although sufficient to support a manslaughter conviction, was insufficient to support his murder conviction. We disagree.
"In determining the sufficiency of the evidence to sustain the conviction, this court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable *Page 184 
to the prosecution." Faircloth v. State, 471 So.2d 485, 489
(Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). Where, moreover, the State establishes a prima facie case, conflicting evidence presents a jury question, which is not subject to review on appeal. See Willis v. State, 447 So.2d 199, 201
(Ala.Cr.App. 1983).
A person commits the crime of murder if "[w]ith intent to cause the death of another person, he causes the death of that person or of another person. . . ." § 13A-6-2(a)(1), Code of Alabama 1975.
After examining the evidence and applying the proper standards of review, we find there was sufficient evidence presented by the State to allow the jury to conclude beyond a reasonable doubt that Hawkins was guilty of the crime as charged. In particular, the State presented the following evidence to prove that Hawkins was guilty of murder:
On December 7, 1989, 41-year-old James Edward Richmond was stabbed to death at his apartment located at 2026-B Cooper Avenue in Anniston. Between 6:30 p.m. and 6:45 p.m. on that day, J.C. Briskie, who lived next door to the victim, heard noises and went next door to see what was happening. When Briskie looked into Richmond's apartment, he saw the victim lying on the floor. Briskie also saw Hawkins, with two knives in his hand, standing over the victim. Briskie told Hawkins that he had better get some help for the victim, and Hawkins told Briskie that there was nothing wrong with the victim. Briskie then went next door to Virgil McClerken's house and had someone call the rescue squad.
After the rescue squad was called, Hawkins appeared at McClerken's house and entered the house with two knives in his hand "looking for someone." Hawkins then spotted John Wright and put the knives at Wright's neck and made Wright go outside with him. Hawkins told Wright that he could go with him or that Hawkins would "do it to him" right then. Wright did not know what Hawkins was talking about. Hawkins took Wright out of McClerken's house and back to the victim's apartment. When Hawkins got to the victim's apartment, he started screaming and attacking Wright with one of the knives. During the scuffle, Hawkins nicked Wright under his chin with the knife. The police arrived at the scene, and Hawkins let Wright go.
When Officer Tim Whatley of the Anniston Police Department arrived at the victim's apartment, he saw Hawkins standing in the door of the apartment, holding a knife at another man's throat. Whatley got out of his car and told Hawkins to put the knife down. Hawkins put the knife down on the stereo, which was immediately inside the door and Whatley then had Hawkins sit down in a chair. Whatley then checked Wright to see if he needed medical attention for the cut under his chin. Whatley then saw the victim lying on his back on the floor with a large amount of blood under his head. The victim was unconscious. At this point, the rescue squad arrived and began attending to the victim.
After the paramedics had transported the victim to the hospital, Whatley secured the crime scene, questioned several people, and arrested Hawkins for assault and for public drunkenness. Investigator Anthony D'Acquisto, of the Anniston Police Department, collected from the crime scene a paring knife, two butcher knives, and a wrench, all of which appeared to have blood on them. He took these items to the Alabama Department of Forensic Sciences where they were examined by a forensic serologist, Phyllis Roland. Ms. Roland tested the stains on these items, together with stains on Hawkins's shirt and determined that the stains were human blood from someone with type A blood. Roland further testified that the stains on the shirt did not come from Hawkins. Typing of the victim's blood revealed that the victim's blood was type A, and Roland testified that the victim's blood was consistent with the blood found on the knives, the wrench, and the shirt.
Dr. Joseph Embry, of the Alabama Department of Forensic Sciences, performed an autopsy on the victim's body. This autopsy revealed that the victim had defensive *Page 185 
wounds on his hands, which occur when one attempts to ward off an attack. The victim had 29 wounds on his head, and 1 main wound in his back which was 5 inches deep. Dr. Embry found that the victim's death was caused by multiple stab wounds.
In Hawkins's statement to the police, he admitted that he and the victim had fought. Hawkins admitted hitting the victim on the head with a piece of firewood and a wrench, but he denied stabbing the victim.
The State clearly presented sufficient evidence that Hawkins intentionally killed the victim. While there was some evidence to support a manslaughter conviction, the question of whether it was murder or manslaughter was a question for the jury to determine. Hence, the trial court properly denied Hawkins's motion for judgment of acquittal on this ground.
 III
Hawkins contends that the trial court erred when it refused to grant his motion for a mistrial on the ground that an emotional outburst by members of the victim's family prejudiced his right to a fair trial.
A motion for a mistrial is a drastic and extreme measure which should be granted only when the prejudicial qualities of the comment or action cannot be eradicated by instructions or other actions by the trial court, Colvette v. State,568 So.2d 319 (Ala.Cr.App.), cert. quashed, (Ala. 1990).
The right to declare a mistrial is within the sound discretion of the trial court, and the trial court's decision rests largely upon the issues and particular circumstances of each case. Newsome v. State, 570 So.2d 703 (Ala.Cr.App. 1989),cert. quashed, (Ala. 1990).
In the case sub judice, there was an emotional outburst from the victim's mother during the testimony of Dr. Embry, who was looking at a photograph depicting certain injuries on the right side of the victim's head. The victim's mother then apparently fainted and there was then an emotional outburst from other family members. The trial court immediately dismissed the jury from the courtroom, and Hawkins's attorney asked the trial court to declare a mistrial due to the emotional outburst. After hearing arguments from both sides, the trial court denied Hawkins's motion for a mistrial. The jury returned to the courtroom, and the trial court instructed the jury as follows:
 "Ladies and gentlemen, I want to speak to you just a moment before we proceed. You were present in the courtroom when we had an incident several minutes ago in which the victim's representative, Mrs. Richmond, was taken from the courtroom. Of course, that was not a planned event by any means.
 "It has nothing to do with your duty and your responsibility or your role as jurors in this case. I am instructing you to give that or anything that occurred as a part of that absolutely no consideration in your deliberations in the case. None of that is evidence in the case. It is to have no import or bearing whatsoever on the issues that you will be called upon to decide as jurors in the case when all of the evidence is in. I am specifically instructing you not to consider it and not to give it any weight, not to give it any consideration. It has absolutely nothing whatsoever to do with your duty and your responsibilities.
 "Let me ask if you each understand that. If any of you don't understand that or if I have not made that clear, please raise your hand.
"(No audible response.)
 "THE COURT: There are no hands raised. Let me ask you if there are any of you who cannot follow those instructions which are that you are to totally disregard that and give it no weight or consideration whatsoever. Is there anyone who cannot put that out of what you must do as jurors in this case? I'm not asking you to totally erase it from your memory. That's humanly impossible. But you have to totally disregard it so far as your duties; that is, it's not evidence. You are to give it no weight. *Page 186 
 "Is there anyone who cannot do that? If you cannot please raise your hand.
"(No audible response.)
 "THE COURT: Let the record show that no hands were raised by the jurors."
This court has considered similar cases and found that the trial court properly denied the motion for a mistrial. InFew v. State, 518 So.2d 835 (Ala.Cr.App. 1987), cert. denied, (Ala. 1988), the trial court properly denied the defendant's motion for mistrial where, immediately after an outburst by a relative of the murder victim during trial, the court instructed the jury to disregard the outburst.
In the instant case, the record does not indicate that the jurors were distracted or disturbed by the emotional outburst from the victim's mother or family. In fact, the trial court stated that it specifically watched the jurors' reactions to the outburst to see whether they were affected. The trial court also instructed the jury to disregard the emotional outburst, and the jury indicated that it would disregard the outburst. The trial court therefore properly denied Hawkins's motion for a mistrial.
 IV
Hawkins contends that the trial court erred when it overruled his objection to the form of the State's question to Dr. Joseph Embry, a forensic pathologist, concerning the cause of the victim's wounds. The State asked Dr. Embry the following question: "Are you able to tell us with any degree of certainty whether or not those particular knives could have caused any of the wounds that you saw on Mr. Richmond['s] body?" (R. 254.)
Hawkins objected to the form of this question and asserts on appeal that the question should have been asked as follows: "Are you able to tell us to a reasonable degree of medical or pathological certainty whether or not those particular knives could have caused any of the wounds that you saw on Mr. Richmond's body?"
Dr. Embry was offered by the State as an expert witness. Section 12-21-160, Code of Alabama 1975, provides that "[t]he opinions of experts on any question of science, skill, trade or like questions are always admissible, and such opinions may be given on the facts as proved by other witnesses."
It is clear that under § 12-21-160, the subject matter of the State's question to Dr. Embry was within his field of expertise. The issue of whether the State correctly asked the question was a matter within the trial court's discretion, and the trial court's decision to overrule the objection to the form of the question does not constitute reversible error. C. Gamble, McElroy's Alabama Evidence § 130.01 at p. 356 (4th ed. 1991).
 V
Hawkins contends that the trial court erred when it allowed into evidence an autopsy photograph of the stab wound above the victim's left eye because this photograph was particularly graphic and was intended to inflame the jury.
"The fact that a photograph is gruesome and ghastly is no reason to exclude its admission into evidence, if it has some relevancy to the proceedings, even if the photographs may tend to inflame the jury." Magwood v. State, 494 So.2d 124, 141
(Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert.denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The admission into evidence of photographs is within the sound discretion of the trial court. Burton v. State, 521 So.2d 91
(Ala.Cr.App. 1987).
It is clear that the trial court properly allowed the photograph into evidence to corroborate the testimony of the forensic pathologist concerning this particular wound. Hence, the trial court did not abuse its discretion when it allowed this photograph into evidence.
 VI
Hawkins contends that the prosecution systematically excluded black persons from the jury on the basis of race, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986). *Page 187 
In Batson, the Supreme Court set out the elements necessary to establish a prima facie case of discrimination:
 "To establish such a case, the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, supra
[430 U.S. 482] at 494 [97 S.Ct. 1272, 1280, 51 L.Ed.2d 498
(1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Avery v. Georgia, 345 U.S. [559], at 562 [73 S.Ct. 891, 893, 97 L.Ed. 1244
(1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire-men from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination."
476 U.S. at 96, 106 S.Ct. at 1723. In determining whether a prima facie case has been established, the trial court is to consider "all relevant circumstances" which could lead to an inference of discrimination. Ex parte Branch, 526 So.2d 609
(Ala. 1987).
"The removal of blacks by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination." Swain v. State, 504 So.2d 347, 351
(Ala.Cr.App. 1986). Under these standards, Hawkins has not made a showing of purposeful discrimination based upon the State's use of peremptory challenges to strike three blacks from the jury. In striking the jury for Hawkins's trial, the State struck three blacks, defense counsel struck one black, and two blacks remained on the jury that convicted Hawkins.
Even if, arguendo, Hawkins had established a prima facie case of racial discrimination, the prosecutor provided valid race-neutral reasons for its challenges.
 "Once the defendant makes a prima facie showing the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."
476 U.S. at 97, 106 S.Ct. at 1723.
The prosecutor struck three blacks from the jury for the following respective reasons: (1) one was an acquaintance of Hawkins, of defense counsel, and of an expert witness for Hawkins; (2) one was young and the three youngest members of the venire, two of whom were white were struck; and (3) one was an acquaintance of an expert witness for Hawkins.
Because the State clearly set forth valid race-neutral reasons for its strikes, the trial court did not err when it denied the Batson motion.
The foregoing opinion was prepared by the Honorable JAMES H. FAULKNER, a former Alabama Supreme Court Justice, and his opinion is hereby adopted as that of this court.
The judgment of the court is affirmed.
AFFIRMED.
All the Judges concur.