Murder; life.
A grand jury in Jefferson County charged in an indictment that Weldon Kay Chafin unlawfully and with malice aforethought killed Nancy Chafin by choking her with his hands or means otherwise unknown.
An arraignment was conducted with counsel present and appellant pleaded not guilty. Later counsel filed a motion to dismiss the indictment and at that time interposed a demurrer. Each was overruled by the court.
After a four-day trial, the jury returned a guilty verdict. Sentence was pronounced in accordance with the verdict and appellant filed a motion for a new trial. A hearing was held and the motion was overruled. *Page 601 
Appellant is before this court as in indigent and represented by the same counsel who conducted his defense at trial.
On Sunday, August 20, 1972, Nancy Chafin disappeared. Mrs. Lorana M. Clark, Nancy Chafin's mother, testified she had seen her daughter on the Wednesday before August 20, and had talked with her on the telephone on the next day. Mrs. Clark stated she had not seen her or talked with her since that time.
Weldon Kay Chafin, Jr., the son of Nancy Chafin, stated his parents were divorced and he lived with his mother at 1809 Breckenridge Lane in Forestdale. He last saw her that Sunday at approximately 7:30 a.m. before he left for work.
Around noon he went home for lunch but did not see his mother. While there he received a telephone call for her from his father. He informed him that she was not there and looked for her at the time.
Returning from work that evening, Weldon Chafin, Jr., becamed concerned and telephoned neighbors, including the Adamses. Eddie Phipps then called and later came to the house. When Jake Adams and his wife arrived, they went to the basement. No evidence of a struggle was found in the house. In fact, the beds were made and Nancy Chafin's purse was found lying near the sink in the bathroom.
The authorities were called and a missing persons report was issued the following day.
Donald F. Haynes, on August 20, 1972 was employed by the Jefferson County Sheriff's Department and held the rank of sergeant. He testified that on August 21, 1972 a missing persons report was made concerning Nancy Chafin. That evening Sgt. Haynes spoke with Weldon Chafin, Sr., who said he had not been to his former wife's house on August 20.
On August 22, Haynes went to Nancy Chafin's house with the toxicologist, Robert Johnson. They discovered stains on the basement floor near a walk-through door. Scrapings of the stains were sealed in envelopes and given to Johnson. The house was not disarranged and photographs were made of the basement.
Robert B. Johnson was employed in the Birmingham Office of the Department of Toxicology and Criminal Investigation. He testified that on August 22, 1972, he went to the residence of Nancy Chafin with Sgt. Haynes of the Jefferson County Sheriff's Department. At that time he and Sgt. Haynes discovered some stains on the basement floor. A benzidine test was made on the scrapings of the stains which showed they were blood. However, he could not determine if the stains were human blood. On further questioning, Johnson stated the scrapings from the stains ". . . were sent to our headquarters office in Auburn."
S.L. Roton was employed by the Jefferson County Sheriff's Department; and on August 22, 1972, he and another officer picked up two envelopes at the State Toxicology Office in Birmingham. He did not know how the envelopes came into possession of the toxicology office in Birmingham, but stated he delivered them to William H. Landrum at the State Toxicology Department in Auburn.
William H. Landrum was employed by the State Department of Toxicology in Auburn as a criminalist and his primary duty was to perform forensic serological analyses. This procedure he explained, involved grouping and testing of dried stains. He testified that on August 22, 1972, at 5:30 P.M., S.L. Roton of the Jefferson County Sheriff's Department, gave him two envelopes. They were signed by Robert B. Johnson in two places, once across the seal. The envelopes were opened and the contents were analyzed. Over the objection of defense counsel, he stated the stains were human blood but responded on cross-examination, that he could not say it was any specific person's. *Page 602 
On August 24, 1972, Sgt. Haynes made photographs of some stains and a print found near the door on the wall of the basement. He said these photographs were turned over to Betty Leroy, a fingerprint technician in the Jefferson County Sheriff's Office. Miss Leroy acknowledged the photographs were given to her. She examined the photograph of the print and stated it ". . . looked like a palm print . . .", but ". . . decided it was not comparable."
Barbara Ann Crowe was employed with Weldon Chafin, Sr., at Barnes Freight Line. On the morning of August 21, 1972, she observed scratches on the appellant's arms; but she had no idea what kind of marks they were. She acknowledged that appellant was employed to handle freight and that she made no comment to him about the scratches. During cross-examination, Mrs. Crowe did not remember the exact day when the marks were observed but thought it was after August 20, 1972. Sgt. Haynes also remembered seeing the marks on appellant's hands and arms on August 21, 1972.
Jake D. Adams testified that he was a neighbor and a friend of the Chafins and recalled talking with the appellant on either the Wednesday or Thursday before Nancy Chafin's reported disappearance on August 20, 1972. They were at Barnes Freight Lines in Birmingham at the time and Weldon Chafin, Sr., remarked:
. . . . . .
 ". . . `Well, Jake, Nancy has finally done it.' I said —
"Q. What did you say in response to that?
 "A. I asked, I said, `what do you mean? What did she do?' He said, `Well, she finally went out on me.' And I said `I don't know what you mean.' And he said, `Well, she went out on a date.' And he said, `I am not going to stand for that.' He said that he followed her, he and another guy, and he said `I won't stand for it.' He said, `I will kill her before I see her do it any more.'
"Q. What did you say or do at that time, please, sir?
 "A. I told him I said, `Weldon' I said, `Ya'll are divorced' and I said `to me that sounds crazy.' And that's all that was said."
Adams stated that on the Saturday evening before Nancy Chafin disappeared, he saw the appellant driving around the block. Adams said his wife, daughter, and Mrs. Chafin were in the house at the time.
Adams went on to say that he had another conversation with Chafin on the Wednesday or Thursday following August 20, 1972, at Union Envelope Company. The record gives the following account of that conversation:
. . . . . .
 "A. He asked me had I heard from the boys and he said he appreciated what I had done for the boys. And he asked me had I heard any news concerning the case of Nancy. And I told him that I had heard they found blood at the end of the stair steps that had been wiped up with a cloth and that they had found a handprint and that they should know who done it within a few days because it had been sent off to be analyzed.
"Q. What did he do or what did he say at that time?
"A. At that time he went into a nervous state —
 "MR. CORRETTI: We object to that and move that it be excluded.
 "THE COURT: Sustain. Exclude it. Disregard it, ladies and gentlemen.
 "Q. What did he say? Did he say anything at that time? *Page 603 
 "A. At that time he said `that is my handprint. They are coming after me.'
"Q. And what did he do after that?
 "A. He fell over on the ground. I picked him up under the arms, taken him inside the building and got some water and bathed his face with it.
"Q. Was anything else said after that?
"A. Not of my remembrance."
Adams also said he learned of Nancy Chafin's disappearance when Weldon Chafin, Jr., called on Sunday, August 20, 1972. Later he went to the Chafin house with his wife, a deputy and Weldon Chafin, Jr.
During cross-examination, Adams admitted selling the Chafins a light tan Buick but denied having any knowledge that it was stolen.
Robert Duncan, who was thirteen years old at the time of the trial, lived across the alley in back of Nancy Chafin's house on August 20. He testified that between 8:00 and 8:30 that morning, he rode a bicycle down the alley to get the morning paper. On his return home he heard a door slam as he was passing the Chafin house. He "looked" and saw Weldon Chafin, Sr., walking around the edge of the house. Duncan waved, but the appellant continued in the direction of a white Chevrolet Impala automobile. The door on the driver's side was open at the time but he did not remember whether the engine was running. The witness had seen the appellant driving this car on many occasions.
During cross-examination Duncan said he was about 110 feet away when he saw the appellant and it was only for a "split second." He said he looked twice, once when he heard the door and then when he waved. Duncan said Chafin was wearing a windbreaker at the time but could have told the grand jury the man was wearing a plaid shirt.
Oscar McDuffie on August 20, lived across the street from the Chafin residence. He testified that around 7:00 A.M. on that Sunday he looked out the window of the front door and saw a gold-looking Buick automobile in the driveway. Later he looked and the Buick was gone and a white Chevrolet was there. When he went out to get the paper at approximately 8:30 A.M. the Chevrolet was gone.
McDuffie stated he had seen the Buick at the Chafin house on a number of accasions and had on many occasions seen Weldon Chafin, Sr., with the white Chevrolet. The witness went on to say he saw no one entering or leaving the house between 7:00 A.M. and 12:30 P.M., but added he had gone to church at 9:30 A.M. When he returned between 12:00 and 12:30 P.M., no vehicles were there.
On cross-examination, McDuffie stated that after the Chafins were divorced he saw Jake Adams and Nancy Chafin alone in the basement of her house. McDuffie said Nancy Chafin was having furnace trouble and he had gone over at her request.
On January 24, 1974, while hunting in a wooded area about 100 yards off Roberta Road in the Republic area of Jefferson County, Harry Frank Day found a human skull and some other remains. They were protruding from the ground from what appeared to be a shallow grave. In the same area near where the grave was found an abandoned cemetery was situated.
Day left the scene and went to a nearby house and called the Sheriff's Department. When the deputies arrived, the skull was turned over to Deputy Cochran and Day directed them to the site where he had found the remains.
Deputy Clyde Amberson testified that on January 24, 1974, he met with Deputy Cochran and was given a human skull, which was turned over to Robert Johnson, the State Toxicologist. *Page 604 
On that day, Johnson went to the wooded area off Roberta Road. Capt. Williams of the sheriff's office was in charge of the investigation, and Sgt. Haynes, along with several other officers were present. At that time a human skull and some other remains were turned over to him.
On further questioning, Johnson testified he had conducted examinations of human remains, although he was not a medical doctor or a pathologist. It was his testimony that he had occasion to observe and examine human skeletal remains between 25 and 30 times, but acknowledged that most of his learning, concerning examinations of skeletal remains, was through reading instead of study under someone. Also he had performed about 1600 autopsies, but they were not medical.
During voir dire examination, Johnson stated a post mortem examination was made but that an autopsy was impossible due to the lack of tissue. Beside the skull, a majority of the skeleton was found including the arms and pelvis. The hyoid bone was not found. He explained this was a small bone located in the neck and the breaking of it was consistent with manual strangulation.
On January 31, 1974, Johnson carried the skull to Dr. Mills, a dentist in Birmingham. An x-ray was made of the lower right jaw bone. This x-ray was compared with one made of Nancy Chafin, a patient Dr. Mills had treated on August 11, 1972.
Dr. John C. Mills testified he was a licensed dentist in Alabama and a graduate of the University of Alabama School of Dentistry. His practice was primarily in the field of endodonics or root canal therapy.
On August 11, 1972, he saw a patient, Nancy Chafin, who was referred to him by another dentist. He recalled seeing Mrs. Chafin on only one occasion and it was at this time an x-ray was made of her lower right bicuspid molar area. The lower right first molar contained a cavity on top of the tooth at the rear, which was excavated. After finding the nerve was not exposed, a temporary filling was placed in the cavity. She was then directed to return to her own dentist.
Robert Johnson of the State Toxicology Department came to see him on January 31, 1974, and brought a human skull. He requested an x-ray be made and at the same time, gave him the name Chafin, which belonged to one of his patients. An x-ray was made of the same area of the skull as that area of Nancy Chafin x-rayed on August 11, 1972. It was Dr. Mills' opinion that the x-rays were of the same person.
On cross-examination, Dr. Mills agreed that two basic dissimilarities were visible in the x-rays. The first was that the x-ray taken of the skull was darker, and second, a tooth was missing from the x-ray taken on January 31, 1974, that was present in the x-ray made of Mancy Chafin on August 11, 1972.
Dr. Mills stated that he did not consult any other dentist or oral surgeon, even though those dissimilarities were shown. The dentist acknowledged he did not record the angulation of either x-ray, nor did he note the exposure, developing, or fixing times on either occasion. He explained that although these were important factors to be considered, the superficial appearance of an x-ray could be changed but not the x-ray itself.
The dentist said it was his standard procedure to use the same exposure time for making x-rays of the area in question. He also explained that the darker appearance of the x-ray taken on January 31, 1974, could be due to the fact that penetration was deeper when no tissue was present, whereas, in the x-ray taken on August 11, 1972, tissue was present. Further, that new developing solution could produce a darker x-ray. *Page 605 
In making his determination, Dr. Mills stated he did not consider percentages and mathematical probabilities. His opinion was based on a comparison of the two x-rays, which revealed: the restoration in the lower right second molar had a very distinct outline, the bone pattern, and the outline of the first bicuspid present in each x-ray. He went on to explain that what he was ". . . calling the lower right first and second molar, could in actuality be the lower right second and third molar."
Upon completion of the State's case, the appellant made a motion to exclude the evidence on the ground that the corpus delicti was not proved. The motion was denied and counsel began appellant's defense by recalling Weldon Chafin, Jr., for further cross-examination.
He testified that on the afternoon of August 20, Jake Adams and Mrs. Adams came to his mother's house and the three of them went to the basement in search of his mother.
After his mother's disappearance he lived in Tennessee with maternal grandmother and while there he had in his possession the light tan Buick that Jake Adams sold his mother. On his return to Birmingham some two months later, Jake Adams said he did not know the Buick was stolen and was sorry he had sold it to Nancy Chafin.
James Earl Smith was employed by the Jefferson County Sheriff's Department and had been attached to the United Narcotic Details Operation for about three years. He testified that in connection with his work with U.N.D.O., he became familiar with Jake Adams and had ". . . been by his house."
Steve Chafin was the sixteen-year-old son of Nancy and Weldon Chafin. On August 20, 1972 he lived with his paternal grandmother, his father, and brother, Jerry. On the Saturday night before the disappearance, he slept with his father. He testified his father was there when he awakened at 8:00 A.M., and did not leave the house between 8:00 A.M. and 9:30 A.M. He stated his father, grandmother, bother Jerry, and a neighbor attended Sunday school that morning. They all left at the same time and his father was driving a blue Malibu Chevrolet automobile. He also said his father remained for church after Sunday school.
During cross-examination he did not remember telling Sgt. Haynes that he had not seen his father that morning except at church.
He recalled that some two months before his mother's disappearance, he and his father had ridden on motorcycles down the little dirt road where the skeletal remains were found. However, he did not remember talking with Randy at his grandmother's house in Tennessee and saying, "`we rode down the road, that dirt road where the skeleton was found and my Father stopped and said, `I have seen all I want to see, turn around.'"
Dr. O.J. Statts was a qualified physician and dentist, licensed in Alabama, and had for the past fifteen years been employed by the University of Alabama Medical Center as Chief of the Division of Anatomic Pathology. He testified that he had made numerous autopsies and dental identifications and had testified on behalf of the State as an expert in making dental identifications. Dr. Statts explained the procedure used in making dental identifications and the importance of exposure and angulation in making x-rays. He stated that a comparison of x-rays of only one tooth, as was allegedly done with Nancy Chafin, could not qualify as a proper dental identification because of the law of probabilities in such identifications. Further, he had conducted an examination of the x-rays and stated that because of the fillings and a missing tooth, two substantial dissimilarities existed which prevented him from saying the x-rays were of the same person. *Page 606 
He concluded that based on his examination of State's exhibits 1 and 2, he could not as a pathologist and as a dentist identify, or say, that the x-rays of the teeth set forth in State's exhibits 7 and 2 were of the same person. However, on cross-examination, Dr. Statts remarked, "I can not make a statement one way or the other about those X-rays being either the supposedly deceased or not."
Dr. Harwell G. Davis, Jr., the Director of Laboratories and Chief Pathologist of the Lloyd Nolan Hospital in Fairfield, testified he had performed over 4000 autopsies. He stated that, from an examination of a human skull alone, a pathologist could not determine with any degree of medical certainty whether a skull was of a male or a female.
Mrs. Merle Chafin, the mother of Weldon Chafin, Sr., lived at 814 Fourth Avenue West in Birmingham on August 20, 1972. At that time, appellant, her grandsons, and a roomer, Robert Hammonds, lived there. Mrs. Chafin testified that on the Sunday morning in question she awoke at approximately 4:45 and observed Weldon Chafin, Sr. sleeping on a "daveno bed" in the living room. About 8:30 A.M. he was awakened and they all left for the First Nazarene Church at approximately 9:30 A.M.
The appellant drove his blue Malibu Chevrolet and the grandsons rode their motorcycles. She followed in her own car, accompanied by a neighbor. After Sunday school and church, they returned home and had lunch. Mrs. Chafin stated that at no time did her son leave her presence on the afternoon of August 20, 1972.
Robert Hammonds roomed at Mrs. Merle Chafin's home on August 20, 1972, and on that Sunday was awakened by Weldon Chafin, Sr., at approximately 8:00 A.M. He testified that the Chafins left for church about 9:30 A.M. and the appellant did not leave the house at any time between 8:00 and 9:30 that morning.
During cross-examination Hammonds recalled having a conversation with Sgt. Haynes concerning the photographs of a woman he could not identify. He did not remember telling the Sergeant: "I did not see Weldon Chafin that morning. I did not see any of them that morning."
Jerry Chafin was the seventeen-year-old son of Nancy and Weldon Chafin, Sr., and on August 20, 1972, lived with his grandmother, Mrs. Merle Chafin. He testified that his father did not leave the house from the time he got up at 8:30 A.M., until 9:30 A.M., on August 20. At that time they all went to Sunday school. After church they returned home and did not leave until that afternoon when they went to the "Hickory Hut" to eat.
Five other witnesses were called and they each testified they had seen Weldon Chafin, Sr. at the First Nazarene Church on Sunday, August 20, 1972.
Weldon Chafin, Sr. stated that at time of his wife's disappearance, they were divorced and he was living with his mother and two sons at 814 Fourth Avenue West. Chafin said he had gone to Sunday school that Sunday with his mother and two sons, and was not at his former wife's house.
He denied driving around his wife's house on Saturday before her disappearance, and making any statements to which Jake Adams testified.
Chafin also denied telling Drayton James, his wife's attorney, "I will give her the divorce but she will be sorry . . . I'll take care of this situation out of court." Drayton James was called by the State as a rebuttal witness and said that the appellant had in fact made those statements.
Lavena Sartain was a member of the First Church of the Nazarene on Graymont Avenue in Birmingham. On Sunday, August 20, 1972, she was the secretary of the Sunday school class. Weldon Chafin, Sr., and his mother were members of that class. She stated the class began at 9:45 *Page 607 
A.M., but the appellant did not arrive until about five or ten minutes after ten on that Sunday. Mrs. Sartain recalled that appellant's mother was present in the class and remembered seeing two motorcycles belonging to his sons, parked outside.
She testified that appellant had not attended the class in a number of Sundays and it could have been as long as two or three months prior to August 20, 1972.
Sgt. Haynes in rebuttal, stated Robert Hammonds told him on August 25, 1972, that he did not see any of the Chafins on the morning of Sunday, August 20.
John Mathew Parker testified on rebuttal he was employed by Union Envelope Company and during the latter part of August, 1972, he witnessed a conversation between Jake Adams and the appellant. He stated the two were in the parking area, and he saw Jake Adams bring the appellant into the office and splash water in his face.
 I
Appellant contends the trial court erred in not granting his motion to exclude or his subsequent motion for a new trial. He argues that the conviction was based purely on circumstantial evidence and that it was insufficient because it did not exclude to a moral certainty every other reasonable hypothesis than that of his guilt.
Our courts have long recognized that a defendant's guilt may be established by circumstantial evidence as well as by direct evidence. Lowery v. State, 38 Ala. App. 505, 88 So.2d 854; Paynev. State, 48 Ala. App. 401, 265 So.2d 185. However, the trial judge must first determine whether there is testimony sufficient to make a prima facia case that the offense was committed. McDowell v. State, 238 Ala. 101, 189 So. 183. If a reasonable inference is deducible of the existence of a prima facia case, then the court must submit the question of sufficiency tending to support that inference to the jury.Martin v. State, 125 Ala. 64, 28 So. 92; Haggler v. State,49 Ala. App. 259, 270 So.2d 690. Where the inferences to be drawn are susceptible to more than one conclusion then they, like the weight of the evidence and the credibility of witnesses are questions for the jury. Willcutt v. State, 284 Ala. 547,226 So.2d 328.
It is also asserted that the corpus delicti was not established. Counsel argues, among other things, that the death of the person alleged to have been killed was not proved. He insists circumstantial evidence alone did not sufficiently prove the identity of the deceased, or the identity of the accused as her killer.
The corpus delicti may be shown by circumstantial evidence. In Johnson v. State, 247 Ala. 271, 24 So.2d 17, the principle was enunciated in the following language:
 "The rule is well settled in this jurisdiction that circumstantial evidence may afford satisfactory proof of the corpus delicti and if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the accused is thereby rendered admissible." (Citations omitted).
The finding of the skeletal remains of the alleged victim, along with the dental identification of Dr. Mills, who treated and x-rayed Nancy Chafin, were circumstances pointing to her demise. They were sufficient, if believed by the jury to establish the identity of the remains and the fact of her death.
Further, the jury could reasonably infer from the circumstances in evidence that the appellant had the opportunity and motive to commit the act charged, and conclude that Nancy Chafin lost her life at his hands. *Page 608 
It is also noteworthy that the court, in its oral charge, instructed the jury as to the measure of proof necessary in this language:
. . . . . .
 "Now, ladies and gentlemen, a person charged with a felony should not be convicted unless the evidence excludes to a moral certainty every reasonable hypothesis but that of the defendant's guilt. No matter how strong the circumstances are they do not come up to the full measure of proof which the law requires if they can be reasonably reconciled with the theory that the defendant is innocent. The test of the sufficiency of circumstantial evidence is whether the circumstances as proved produce a moral conviction to the exclusion of all reasonable doubt of the guilt of the accused whether they are incapable of explanation upon any reasonable hypothesis consistent with his innocence. Now as I stated to you before the burden of proof is on the State to convince you from the evidence beyond a reasonable doubt and to a moral certainty of the guilt of the defendant and this is true whether the evidence be direct, circumstantial or both . . ."
Based upon the foregoing facts, and the principles of law cited, this court is of the opinion that there was no error in refusing the motion to exclude, or in denying the motion for a new trial on the ground the evidence was insufficient.
 II
Appellant maintains the fact a person is a practicing dentist does not qualify him to give expert testimony concerning dental identification. Counsel argues that although Dr. Mills was a licensed dentist with years of experience, he was unaware of the fundamental aspects of the procedures involved in making dental identifications and his testimony should have been excluded.
Whether a witness is shown to possess the requisite qualifications is a preliminary question addressed to the trial judge's discretion. King v. State, 266 Ala. 232, 95 So.2d 816;Desilvey v. State, 245 Ala. 163, 16 So.2d 183. Any objection to an expert witness on the ground that he lacked knowledge goes to the weight rather than to the admissibility of his testimony. Kitchens v. State, 31 Ala. App. 239, 14 So.2d 739.
Dr. Mills saw Nancy Chafin as a referral patient nine days before her disappearance. Her lower right bicuspid molar area was x-rayed and a temporary filling was placed in the lower right molar. Eighteen months later Dr. Mills x-rayed the same area on the human skull brought to him by Johnson. After observing the two x-rays, it was his opinion they were x-rays of the same person.
Dr. Mills stated he made thousands of x-rays each year and standard procedures were used in making them. In making the x-rays in question, the dentist said the long cone technique was employed and the same machine was used. He said the angulation, exposure, fixing and developing times were the same for each.
Based upon Dr. Mills' personal observation and a treatment of the alleged victim, Nancy Chafin, and of the x-rays he personally made of her and the one he made of the human skull, we believe he was qualified to make the dental identification.
In view of the foregoing and after an examination of: Gustafson, G., Forensic Odontology, (1966), and Cameron/Sims,Forensic Dentistry, (1974) cited to us by appellant, we are unwilling to say the court abused its discretion in admitting the testimony of this witness.
 III
It is appellant's contention that the proper predicate was not established for the admission *Page 609 
of testimony concerning scrapings of the stains taken from the alleged victim's house. He maintains a complete chain of custody was not shown and argues the State failed to account for the stains from the time they were taken from the Chafin house, until the time they were delivered to Landrum in Auburn. Counsel insists that since a necessary link in the chain of evidence was missing, Landrum's testimony concerning the analysis of the stains was completely prejudicial and erroneously permitted.
Our examination of the record indicates that scrapings of the stains were taken from the Chafin basement on August 22, 1972, by Robert Johnson, the toxicologist in Birmingham and Sgt. Haynes. A benzidine test was made by Johnson at that time and he concluded the scrapings were blood. Afterwards, the scrapings were sealed in two envelopes by Sgt. Haynes and turned over to Johnson, who stated they were sent to the State Headquarters of Toxicology in Auburn.
On the same day, August 22, Deputy Roton picked the envelopes up at the toxicologist's office in Birmingham and delivered them to Landrum in Auburn. It was Landrum's testimony that he received two envelopes bearing the name, Robert B. Johnson, from Deputy Roton at 5:30 P.M. on August 22, 1972.
It is true that Sgt. Haynes gave the envelopes to Johnson, the toxicologist, and Johnson did not testify that he delivered them to Deputy Roton. However, it is also true that Johnson stated the scrapings were sent to Auburn and that Deputy Roton picked the envelopes up at the toxicologist's office the same day that the toxicologist received them from Sgt. Haynes.
In our judgment the chain of custody of the envelopes was sufficient to establish a jury question as to the accuracy of their identification. Their admission was proper. Green v.State, 42 Ala. App. 439, 167 So.2d 694; McClary v. State,51 Ala. App. 30, 282 So.2d 379; Oury v. State, 53 Ala. App. 240,298 So.2d 661.
We have searched the record and did not find any error.
AFFIRMED.
TYSON, HARRIS, and BOOKOUT, JJ., concur.