The appellant, James David Beard, was indicted during the August 1990 term by the grand jury of Marshall County in a two-count indictment for the offenses of murder, made capital because it was committed during a robbery in the first degree, in violation of § 13A-5-40(a)(2) (Count I), and of murder made capital because it was committed during a burglary in the first degree, in violation of § 13A-5-40(a)(4) (Count II). The indictment reads, in pertinent part, as follows:
"[Count I]
 "The Grand Jury of said County charge that before the finding of this Indictment James David Beard . . . did intentionally cause the death of another person, Jesse H. Pitts, by shooting him with a pistol and James David Beard caused said death during the time that James David Beard was in the course of committing a theft of an undetermined amount of lawful money or currency of the United States of America, a further description which to the Grand Jury is otherwise unknown, the property of Jesse H. Pitts, by threatening the imminent use of force against the person of Jesse H. Pitts, with intent to compel acquiescence to the taking [of] or escaping with the property, while the said James David Beard was armed with a deadly weapon, to-wit: a pistol, a further description *Page 1337 
which to the Grand Jury is otherwise unknown, in violation of § 13A-5-40(a)(2) of the Code of Alabama, 1975, as last amended. . . .
"COUNT II
 "The Grand Jury of said County charge that before the finding of this Indictment James David Beard . . . did intentionally cause the death of Jesse H. Pitts, by shooting him with a pistol and James David Beard caused said death during the time that James David Beard knowingly and unlawfully entered or remained, or attempted to enter or remain, unlawfully in the dwelling of Jesse H. Pitts, with intent to commit the crime of theft, therein, and while effecting entry or while in the dwelling or in immediate flight therefrom, said James David Beard, was armed with a deadly weapon, to-wit: a pistol, a further description which to the Grand Jury is otherwise unknown, in violation of § 13A-5-40(a)(4) of the Code of Alabama, 1975, as last amended. . . ."
At arraignment on February 4, 1991, the appellant pleaded not guilty. On April 13, 1991, a jury found him guilty of the capital offense of murder committed during a burglary in the first degree, as charged in Count II (§ 13A-5-40(a)(4)). After a sentencing hearing before the jury in accordance with §§ 13A-5-43 through -46, the jury, by a majority vote of eight to four, returned an advisory verdict recommending a sentence of life imprisonment without the possibility of parole. See § 13A-5-46(f) (providing, in part, that "an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors"). Thereafter, the trial court held another sentencing hearing in accordance with §§ 13A-5-47 through -52, and on June 14, 1991, sentenced the appellant to death.
The state's evidence disclosed as follows. On Monday morning, February 26, 1990, the body of Jesse H. Pitts was discovered in his residence in Albertville, Marshall County, Alabama. He was a jeweler, was 72 years of age, had an artificial leg, and lived alone. His jewelry business and his living quarters were both located in the same residential-type building. His business, which was separated from his residence, was in the front portion of the building, and his living quarters or residence was in the rear of the building. His body was discovered by his housekeeper when she came to work on Monday morning. It was nude and face-down in a pool of blood in the hallway. His housekeeper had last seen him alive around 11:30 a.m. on Saturday, February 24, 1990.
An autopsy disclosed that the victim had three gunshot wounds: one in the abdomen, one in the chest, and one in the forehead. The wound in the abdomen indicated that that shot had not been fired from close range, and this wound would not have been fatal. The chest and forehead wounds indicated that the gun had been fired from close range. These entrance wounds were surrounded by powder burns or "stippling." The chest wound would have brought death within 10 minutes, and the forehead wound would have been "rapidly fatal." The cause of death was the gunshot wounds to the victim's chest and forehead. The bullets that caused the abdomen and chest wounds exited the body, and the bullet that caused the forehead wound was recovered from the victim's cranium. The condition of the body and the undigested food in the victim's stomach indicated that death occurred late Saturday night, February 24, 1990.
The evidence at the scene indicated that the victim was shot first while in what is referred to as the northeast bedroom and that, even though wounded, he moved from the bedroom into the hallway, leaving a trail of blood from the bedroom to the location where his body was found in the hall. Apparently five bullets were fired when the crime was committed. One bullet was embedded in the wall of the hallway, two bullets were embedded in the wall of the northeast bedroom, one bullet was found on the floor at the foot of the bed in the northeast bedroom where it had apparently hit the headboard of the bed and ricocheted to the floor, and one bullet was found in the victim's skull. All the bullets were recovered except one in the bedroom wall; it had fallen into the foundation of *Page 1338 
the building. The bullets were identified as having been fired from a .38 caliber pistol. The investigation at the scene also revealed a pair of women's yellow socks on the kitchen table; the victim's shirt hanging on a chair near the kitchen table; his trousers hanging on a bedpost in the bedroom where he usually slept; and a white towel on the bed in the northeast bedroom that contained semen stains and two pubic hairs.
When the victim's housekeeper first arrived at the victim's residence on Monday morning, February 26, 1990, she discovered that the jewelry shop was locked and that the burglar alarm was activated. She went from the front of the building to the rear, where the victim's living quarters were located. She found the back door partially open and the separate burglar alarm for the residential portion of the building not activated. It was unusual for the back door to be unlocked. Becoming alarmed, she went next door and got a young man to accompany her into the house, where she discovered the victim's body. There was no evidence of a forced entry into the house.
On the Saturday morning when she last saw the victim alive, the housekeeper observed him with a roll of from "four to five hundred" $100 bills. She also knew that he carried a new billfold, which contained his "papers" and that he kept a .38 caliber pistol lying on a cabinet in the kitchen. Several days before that Saturday that she last saw the victim alive, she observed him write the serial number of the pistol in his telephone book. He told her that if anything ever happened, she should tell the police where he had written the serial number. On the morning that she discovered the victim's body, she observed that the victim's wallet, money, and pistol were missing. She advised the investigators of the location of the serial number, and written in the victim's handwriting on the first page of the telephone book was "Charter Arms .38 Special, Serial number 666482."
On March 7, 1990, the police observed the appellant driving a U-Haul truck north on Interstate 59. Jason Childers was a passenger in the truck. The truck had been rented by the appellant's girlfriend, Tammy Blackburn. The police had a warrant for the appellant's arrest for a probation violation, so they stopped the truck and arrested the appellant pursuant to the warrant. The truck was taken to the Etowah County Sheriff's parking lot, where an inventory search of the truck was conducted. During the search, a .38 caliber pistol was discovered in a guitar case, and a box of .38 caliber live pistol cartridges was found in a brown suitcase. The pistol's serial number was "666482," and the pistol was subsequently identified as the victim's pistol. The appellant's fingerprints were found on two of the cartridges in the box. The state's evidence showed that the guitar and case and the brown suitcase belonged to the appellant.
An expended .38 caliber pistol cartridge was found in an automobile belonging to Terri Cranford, a friend or acquaintance of the appellant. The appellant and Tammy Blackburn had occasionally used this automobile and had possibly used it on the date of the commission of the crime. It was determined that this expended cartridge had been fired from the victim's pistol.
The bullets recovered from the scene of the crime, including the one recovered from the victim's cranium, were compared with bullets subsequently fired from the victim's pistol. The ballistics expert concluded that they had the same general lands characteristics, i.e., the same numbers and sizes of lands and grooves; however, there were insufficient specific characteristics to positively say that they had been fired from that pistol. Thus, the recovered bullets could have been fired from that pistol, but the expert could not positively say that they were. A forensic scientist found that the two pubic hairs found on the towel in the victim's northeast bedroom were consistent with pubic hairs of Tammy Blackburn. He stated that they were "very similar," but he could not make a positive identification.
Terri Cranford, in addition to identifying the guitar and case and the brown suitcase as belonging to the appellant, positively identified the victim's pistol as one she had seen in the possession of the appellant a *Page 1339 
few days after the murder of the victim. She also stated that the appellant had obtained a file with the intention of filing off the serial number. She also found, in her automobile, Albertville newspapers telling of the Pitts murder.
Jason Childers, who was 16 years old in February 1990, married Sherry Blackburn, the sister of Tammy Blackburn, on February 22, 1990. On February 23, 1990, he and Sherry moved into Terri Cranford's house in Gadsden. On Saturday, February 24, 1990, the date of the commission of the crime, he, Sherry, the appellant, Tammy Blackburn, Charity Blackburn (Tammy and the appellant's daughter), and Terri Cranford were staying at Cranford's residence. At trial, Childers testified that, on the day of the commission of the crime, the appellant and Tammy Blackburn left together in the early evening and returned about three hours later, about 11:00 p.m., and that when they returned, Tammy had a roll of money in her hand. He further testified that on March 1, 1990, Tammy and the appellant redeemed the guitar and case from a pawn shop, and bought him and Sherry wedding rings. He stated that about this same time, he saw the appellant with a .38 caliber pistol; that the appellant said, "Look at my new gun"; and that he handled it and looked at the serial number. He testified that he remembered the number as having three "6's" and "482"; that his attention was drawn to the three "482" because that was the "sign of the devil"; and that he remembered "482" because that was part of his grandmother's telephone number. He positively identified the victim's pistol as the one he had seen in the appellant's possession and the one with the serial number "666482." He testified that the appellant had purchased a file and that he had indicated that he intended to file off the serial number of the pistol. He identified the guitar and case as belonging to the appellant.
Childers further testified that, shortly after Pitts's murder, he went with the appellant, at the appellant's request, to Albertville so that the appellant could get the newspapers to read about the murder; that, while the appellant was sitting in the automobile reading the newspaper accounts of the murder, he asked the appellant if he knew anything about it; and that the appellant said, "Yeah, I killed old man Pitts." Childers further testified that the appellant told him how he shot the victim and how he and Tammy Blackburn went in the victim's home. He stated that the appellant said that he told Pitts to lay down and that he would not; that he told Pitts to give him all his money; that he wanted him to open his safe; that Pitts would not lie down, so he shot him; that he first shot Pitts in the side; that Pitts started coming for him and that he shot him again; that he told Pitts, "I'll shoot you"; and Pitts said, "You'll have to"; and that he shot Pitts a third time in the head. Childers also stated that, when the appellant told him that he had shot Pitts in the head, the appellant pointed at his own head. He stated that the appellant told him that he had gotten $250 from Pitts.
Shortly after the appellant was arrested, he was questioned by investigators. A portion of his statement, which was exculpatory, was introduced by the state and was admitted into evidence. In it, he denied any knowledge of or participation in the crime, and he denied any knowledge of the pistol, the guitar, and the guitar case, which were seized from the U-Haul truck he was driving at the time of his arrest.
The appellant neither testified nor offered any evidence in his behalf. On appeal, he does not question the sufficiency of the evidence to support the conviction; however, at the close of the state's evidence-in-chief, he moved for a judgment of acquittal on the ground that the state failed to prove a prima facie case of the offenses charged. This motion was overruled. Even though the sufficiency of the evidence is not urged by the appellant as an issue on appeal, because this is a capital case we have nevertheless reviewed the state's evidence to determine whether the denial of the motion for a judgment of acquittal under the facts and circumstances of this case was proper.
In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, *Page 1340 
this court must review the evidence in the light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485
(Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985); Cumbov. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied,368 So.2d 877 (Ala. 1979). The action of the trial court in denying a motion for a judgment of acquittal must be reviewed by determining whether, at the time the motion was made, there existed legal evidence before the jury from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199
(Ala.Cr.App. 1983); Thomas v. State, 363 So.2d 1020
(Ala.Cr.App. 1978).
A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. Chafin v.State, 333 So.2d 599 (Ala.Cr.App.), cert. denied,333 So.2d 609 (Ala. 1976). As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. Agee v.State, 470 So.2d 1331 (Ala.Cr.App. 1985).
In the instant case, we have examined the evidence presented by the state and, in so doing, have applied the standard of review set out above. The state's evidence is both direct and circumstantial. The evidence presented by the state, along with the reasonable and fair inferences to be drawn from it, was sufficient, in our opinion, for the jury to find the appellant guilty beyond a reasonable doubt. Accordingly, the appellant's motion for a judgment of acquittal was properly denied. The evidence presented by the state was sufficient to establish a prima facie case of murder-burglary, as charged in Count II of the indictment. The appellant, in his original and reply briefs, raises 10 issues on appeal. However, we need not address all of them, because one warrants reversal.
 I.
The appellant contends that the trial court committed reversible error by denying his motion to suppress certain evidence seized during the inventory search of the U-Haul truck he was driving at the time of his arrest. He argues that the police procedures for conducting inventory searches were insufficient to justify an inventory search and that the inventory search was a subterfuge to obtain evidence without obtaining a search warrant. He also contends that his arrest was a pretext to justify the inventory search.
After the suppression hearing, the trial court denied the motion to suppress on the ground, inter alia, that the appellant had no reasonable expectation of privacy in the vehicle and, therefore, he lacked standing to challenge the search and seizure.
A defendant seeking to establish standing to challenge the introduction of evidence obtained as a result of an alleged violation of the Fourth Amendment must demonstrate that he has a legitimate expectation of privacy in the area searched.Cochran v. State, 500 So.2d 1161 (Ala.Cr.App. 1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala. 1985), on remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064
(Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965,95 L.Ed.2d 537 (1987); Collier v. State, 413 So.2d 396
(Ala.Cr.App. 1981), aff'd, 413 So.2d 403 (Ala. 1982).
After reviewing the evidence, we conclude that the appellant failed to establish a reasonable expectation of privacy in the vehicle and, thus, that he lacked standing to challenge the search of the vehicle. See, e.g., United States v.Arango, 912 F.2d 441 (10th Cir. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991) (defendant lacked standing to object to search of vehicle when he failed to show he gained possession from owner or from someone with authority to grant possession); United States v.Smith, 621 F.2d 483 (2d Cir. 1980), cert. denied,449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981) (driver who was not owner lacked standing where he made no showing that he had any legitimate basis for being in the automobile); Ex parteCochran, supra (one who made no showing in a motion to suppress that he either owned a car in which evidence had been obtained or had permission to use the car had made no showing that he had a legitimate expectation of privacy in the car and, thus, lacked standing to challenge the search as illegal);State v. Bottelson, 102 Idaho 90, 625 P.2d 1093 (1981) *Page 1341 
(no standing where defendant failed to show he owned or had a right to possess the automobile).
 II.
The appellant contends that the trial court erred in overruling his motion to suppress his extrajudicial statement on the ground that the statement was obtained in violation of his constitutional right to remain silent. On March 7, 1990, the appellant was interviewed by Investigator Robert Norwood of the Marshall County Sheriff's Department. Norwood testified that before questioning, he advised the appellant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); that the appellant acknowledged that he understood those rights; that he signed a waiver to that effect and agreed to talk with the officer; and that he made a statement which was tape-recorded. The waiver stated that he had read and had understood his rights, that he was willing to make a statement and answer questions, that he did not want a lawyer, that he knew what he was doing, and that no promises or threats had been made. Norwood further testified that no threats or promises were made to the appellant and that the appellant was not under the influence of drugs or alcohol at the time of the statement. The portion of the statement admitted into evidence was related orally through Norwood's testimony. The tape-recorded statement was not introduced into evidence. In the portion of the statement introduced through Norwood, which was exculpatory, the appellant denied any knowledge of the crime and of the incriminating items seized in the inventory search of the U-Haul truck.
The appellant contends that he invoked his right to remain silent, but that the questioning continued in violation of hisMiranda rights. The state contends that the appellant's statement that he wanted to stop the questioning referred only to questions about the guitar and the guitar case and that he willingly agreed to continue answering questions about other matters. An examination of the record supports the state's contention. It clearly discloses that the appellant's comment that he did not "want to talk about it" referred only to the guitar. In an effort to clarify the appellant's comment, the officer asked him, "You said that you don't want to talk about it, okay. But you don't want to talk about the guitar or you don't want to talk to us anymore?" The appellant responded, "[A]bout the guitar anymore." The trial court granted the appellant's motion to suppress all references to the guitar and the guitar case in the statement after he stated that he did not want to talk about the guitar anymore; however, it overruled the motion to suppress the remaining portions of the statement.
When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request. Martin v.Wainwright, 770 F.2d 918 (11th Cir. 1985), modified on other ground, 781 F.2d 185, cert. denied, 479 U.S. 909,107 S.Ct. 307, 93 L.Ed.2d 281 (1986); Thompson v.Wainwright, 601 F.2d 768 (5th Cir. 1979); Stewart v.State, 562 So.2d 1365 (Ala.Cr.App. 1989); Bush v.State, 523 So.2d 538 (Ala.Cr.App. 1988). Here, the appellant's comment was ambiguous, and the officer conducting the interrogation was obviously seeking a clarification of the comment, which was entirely proper. The record supports the conclusion that the appellant's comment was not an invocation of his constitutional right to remain silent except as to questions relating to the guitar and guitar case. We find that the portion of the statement admitted into evidence was given voluntarily by the appellant after proper Miranda
warnings. The ruling of the trial court granting the motion to suppress as to all references to the guitar and guitar case after the appellant indicated that he did not want to discuss them further and overruling the motion as to all other matters in the statement were proper. That portion of the statement other than that suppressed was properly admitted into evidence.
 III.
The appellant contends that the trial court committed reversible error when it *Page 1342 
instructed the jury that the unexplained possession by the appellant of recently stolen property belonging to the victim created a rebuttable presumption that the appellant participated in the capital crime charged, i.e., the murder of the victim during the commission of a burglary.[1]
The jury instruction under scrutiny occurred near the completion of the court's charge to the jury and is as follows:
 "A presumption of fact occurs when a known or proven fact gives rise to an inference that another essential fact is true. For example, the wearing of glasses creates a presumption that the wearer has some sight problems. Such a presumption however is rebuttable.
 "The unexplained possession by an accused of recently stolen property taken in a crime creates a rebuttable presumption that the accused participated in the crime.
 "Such presumption is rebuttable and the jury may determine in its judgment that it has been satisfactorily explained by the evidence produced or satisfactorily explained by the presumption of the Defendant's innocence or both.
 "The jury may determine that it has not been satisfactorily explained or rebutted and that the inference of guilt created is strong enough to satisfy them beyond a reasonable doubt of the Defendant's guilt of the offense charged. [Emphasis added.]"
The appellant timely objected to this instruction, thus preserving the alleged error for review. He argues in brief that the instruction "impermissibly relieved the state of proving every element of its case beyond a reasonable doubt." He further argues that the "alleged possession of the gun stolen during the burglary and killing of Mr. Pitts is not . . . sufficient for a rational juror to find beyond a reasonable doubt that he intentionally killed Mr. Pitts during the course of a burglary."
 "Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime — that is, an 'ultimate' or 'elemental' fact — from the existence of one or more 'evidentiary' or 'basic' facts. E.g., Barnes v. United States, 412 U.S. 837, 843-844 [93 S.Ct. 2357, 2361-62, 37 L.Ed.2d 380] [(1973)]; Tot v. United States, 319 U.S. 463, 467
[63 S.Ct. 1241, 1244, 87 L.Ed. 1519] [(1968)]; Mobile, J. K.C.R. Co. v. Turnipseed, 219 U.S. 35, 42 [31 S.Ct. 136, 137, 55 L.Ed. 78] [(1910)]. The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364
[90 S.Ct. 1068, 1072, 25 L.Ed.2d 368] [(1970)]; Mullaney v. Wilbur, 421 U.S. [684,] at 702-703, n. 31 [95 S.Ct. 1881, 1891-92, n. 31, 44 L.Ed.2d 508] [(1975)].
 "The most common evidentiary device is the entirely permissive inference or presumption, which allows — but does not require — the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. See, e.g., Barnes v. United States, supra, [412 U.S.], at 840 n. 3 [93 S.Ct. at 2360 n. 3]. . . . Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a *Page 1343 
jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination.
 "A mandatory presumption is a far more troublesome evidentiary device. For it may affect not only the strength of the 'no reasonable doubt' burden but also the placement of that burden; it tells the trier that he or they must find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts. E.g., Turner v. United States, [396 U.S. 398,] 401-402, and n. 1 [90 S.Ct. 642, 644-45, 24 L.Ed.2d 610
(1970)]; Leary v. United States, 395 U.S. 6, 30 [89 S.Ct. 1532, 1545, 23 L.Ed.2d 57] [(1969)]; United States v. Romano, 382 U.S. 136, 137, and n. 4, 138, 143 [86 S.Ct. 279, 280, and n. 4, 280, 283, 15 L.Ed.2d 210] [(1965)]; Tot v. United States, supra [319 U.S.], at 469 [63 S.Ct. at 1245]. In this situation, the Court has generally examined the presumption on its face to determine the extent to which the basic and elemental facts coincide. E.g., Turner v. United States, supra [396 U.S.], at 408-418 [90 S.Ct. at 64853]; Leary v. United States, supra [395 U.S.], at 45-52 [89 S.Ct. at 1552-57]; United States v. Romano, supra [382 U.S.], at 140-141 [86 S.Ct. at 281-82]; Tot v. United States, 319 U.S., at 468 [63 S.Ct., at 1245]. To the extent that the trier of fact is forced to abide by the presumption, and may not reject it based on an independent evaluation of the particular facts presented by the State, the analysis of the presumption's constitutional validity is logically divorced from those facts based on the presumption's accuracy in the run of cases. It is for this reason that the Court has held it irrelevant in analyzing a mandatory presumption, but not in analyzing a purely permissive one, that there is ample evidence in the record other than the presumption to support a conviction. E.g., Turner v. United States, 396 U.S., at 407
[90 S.Ct., at 647]; Leary v. United States, 395 U.S., at 31-32 [89 S.Ct., at 1545-46]; United States v. Romano, 382 U.S. at 138-139 [86 S.Ct. at 280-81]".
County Court of Ulster County, New York v. Allen,442 U.S. 140, 156-60, 99 S.Ct. 2213, 2224-26, 60 L.Ed.2d 777 (1979) (footnotes omitted, emphasis in original).
In the instant case, the basic or predicate fact supporting the presumption is the appellant's possession, within a few days of the murder-burglary, of a pistol purportedly stolen from the victim's home during that crime. The presumed or elemental fact that the jury was instructed to conclude from proof of that possession is that the defendant participated in the burglary of the victim's residence and in the victim's murder, with a particularized intent to kill.
The attorney general does not cite any case where a charge similar to the one before us has been given in a capital case. Nor can we find a case where a similar charge was given or approved in a case with similar facts.
In addressing this issue, we begin our analysis as follows:
 "In determining whether the instruction creates a mandatory presumption or a permissive inference, we initially focus on the specific language that is challenged. If a jury could reasonably have understood that portion of the jury charge as creating a presumption that relieves the state of its burden of persuasion on an element of the offense, the potentially offending words must be considered in the context of the entire charge. 'Other instructions might explain the infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption.' [Francis v. Franklin, 471 U.S. 307
[105 S.Ct. 1965, 85 L.Ed.2d 344] (1985)] (citing Cupp v. Naughten, 414 U.S. 141, 147
[94 S.Ct. 396, 400, 38 L.Ed.2d 368] . . . (1973))."
Coleman v. Butler, 816 F.2d 1046, 1048 (5th Cir. 1987). See also Carella v. California, 491 U.S. 263,265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989) (wherein the Court stated that it "explained in Francis [v.Franklin, 471 U.S. 307, 105 S.Ct. 1965, *Page 1344 85 L.Ed.2d 344 (1985),] and Sandstrom [v. Montana,442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979),] that courts should ask whether the presumption in question is mandatory, that is, whether the specific instruction, both alone and in the context of the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State proves certain predicate facts").
First, in examining the isolated portion of the instructions (that portion stating the presumption and emphasized above), we find it create's a mandatory presumption, because a reasonable juror could have understood it to require him to find the presumed guilt for murder-burglary if the prosecution proved the appellant's unexplained possession of the stolen property, unless the appellant came forward with evidence to rebut the presumed connection. In other words, a reasonable juror could have understood it to create a presumption that relieved the prosecution of its affirmative burden of persuasion on the core elements of the offense of murder-burglary once it had proved the appellant's possession of stolen property. See Francisv. Franklin, 471 U.S. 307, 315-16, 105 S.Ct. 1965,1971-72, 85 L.Ed.2d 344 (1985). It is not permissive, because a permissive presumption "does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved," id. at 314, 105 S.Ct. at 1971.
Our inquiry does not end with our review of the isolated charge; we must consider it in the context of the charge as a whole. Id. at 315, 105 S.Ct. at 1971; Coleman v.Butler, 816 F.2d at 1048. We consider that the instructions immediately following (the last two paragraphs quoted above) merely explained to the jury that the mandatory presumption was rebuttable.
 "A mandatory presumption may be either conclusive or rebuttable. A conclusive presumption removed the presumed element from the case once the State has proved the predicate facts giving rise to the presumption. A rebuttable presumption does not remove the presumed element from the case but nevertheless requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted. See Sandstrom v. Montana, 442 U.S. 510
[99 S.Ct. 2450, 61 L.Ed.2d 39] (1979)."
Franklin, 471 U.S. at 314, n. 2, 105 S.Ct. at 1971, n. 2. See also Miller v. Norvell, 775 F.2d 1572, 1575
(11th Cir. 1985), reh'd denied, 780 F.2d 1033 (1985), cert. denied, 476 U.S. 1126, 106 S.Ct. 1995, 90 L.Ed.2d 675 (1986) (wherein the court stated that the difference between a permissive inference and a mandatory rebuttable presumption is "that, unlike a permissive inference, a mandatory rebuttable presumption requires a jury to find that the presumed fact follows the proven fact unless the defendant produces evidence to rebut the existence of the presumed fact") (emphasis in original).
Yet, simply because a reasonable juror could have understood the instructions together to create a mandatory rebuttable presumption, "the instructions [were] no less constitutionally infirm," Franklin, 471 U.S. at 317, 105 S.Ct. at 1972.
 "A mandatory rebuttable presumption does not remove the presumed element from the case if the State proves the predicate facts, but it nonetheless relieves the State of the affirmative burden of persuasion on the presumed element by instructing the jury that it must find the presumed element unless the defendant persuades the jury not to make such a finding. A mandatory rebuttable presumption is perhaps less onerous from the defendant's perspective, but it is no less unconstitutional. Our cases make clear that '[s]uch shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.' Patterson v. New York, 432 U.S. [197], 215 [97 S.Ct. 2319, 2329, 53 L.Ed.2d 281] [(1977)]."
Id. We find that a reasonable juror would have been clearly aware that the appellant bore the affirmative burden of persuading the jury that such a presumption was unwarranted. *Page 1345 
See id. at 318, 105 S.Ct. at 1973.
In construing the instructions in the context of the charge in its entirety, we note that the attorney general, in contending that the appellant was not deprived of a fair trial or of due process of law, urges us to consider the questioned charges specifically in light of the trial court's instructions on the principle that the indictment creates no proof of presumption or inference of guilt; on the prosecution's burden of proving the appellant's guilt; on the presumption of innocence; on the principle that counsel may argue reasonable inferences from the evidence; and on the principle that the jury is to consider the testimony "together with all proper and reasonable inferences therefrom and apply your common sense." Contrary to the attorney general's argument, we cannot see how these instructions corrected or qualified the instructions in question. No other language explained the instructions under scrutiny. We do not consider that these instructions emphasized by the attorney general, when taken together, could have led a reasonable juror to believe that he was permitted, rather than required, to draw the conclusion directed by the trial court. See id. at 315-16, 105 S.Ct. at 1971-72. Moreover, we cannot find how they "explained the proper allocation of burdens with sufficient clarity that any ambiguity in the particular language challenged could not have been understood by a reasonable juror as shifting the burden of persuasion,"id. at 319, 105 S.Ct. at 1973. For example, "[g]eneral instructions on the State's burden of persuasion and the defendant's presumption of innocence are not 'rhetorically inconsistent with a conclusion or burden-shifting presumption,' because '[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to [the elements of murder-burglary] could be satisfied,' " id. at 319,105 S.Ct. at 1974 (quoting Sandstrom,442 U.S. at 518-19, n. 7, 99 S.Ct. at 2456, n. 7).
Therefore we conclude that, when combined with the immediately succeeding two paragraphs, the presumption instruction could reasonably be read as instructing the jury that it was required to infer or presume all core elements of murder-burglary from the appellant's possession of the stolen pistol unless the appellant satisfactorily explained his possession and, thus, persuaded the jury that such a presumption was unwarranted. We consider that this mandatory presumption violates the Due Process Clause of the Fourteenth Amendment which "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," In reWinship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073,25 L.Ed.2d 368 (1970), because a reasonable juror could have interpreted it as relieving the prosecution of its burden of persuasion beyond a reasonable doubt on essential elements of the offense of murder-burglary. See Franklin,471 U.S. at 313, 105 S.Ct. at 1970. See also Carella,491 U.S. at 265, 109 S.Ct. at 2420. As the Court in County Court ofUlster County recognized, "In a [mandatory presumption] situation, since the prosecution bears the burden of establishing guilt, it may not rest its case entirely on a presumption unless the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt," 442 U.S. at 167,99 S.Ct. at 2229-30. Although there was other evidence of guilt, the quoted instructions authorized conviction even if the jury disbelieved all testimony except proof of the appellant's possession of the pistol; it could not have been clear to a reasonable juror that the presumption was not the sole or sufficient basis for a finding of guilt. Reviewing the presumption on its face, we find that, clearly, proof of a defendant's possession of property stolen in a murder-burglary is insufficient to support the presumption of that defendant's guilt of the murder-burglary beyond a reasonable doubt.
Put another way, the instant presumption undermined the jury's responsibility at trial, based on evidence adduced by the prosecution, to find the ultimate facts beyond a reasonable doubt. See County Court of Ulster County,442 U.S. at 156, 99 S.Ct. at 2224. By its language in the *Page 1346 
context of the charge as a whole, the instant presumption did not permit a reasonable juror to reject it based on an independent evaluation of the other evidence presented by the prosecution, see id. at 159, 99 S.Ct. at 2226; the instant directions "directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offenses with which [the appellant] was charged," Carella, 491 U.S. at 266, 109 S.Ct. at 2420. Moreover, the challenged instructions do not comport with the requirements of due process because they shifted the burden of persuasion on crucial elements of murder-burglary, and because the charge, read as a whole, did not explain or cure the error. See Franklin, 471 U.S. at 325, 105 S.Ct. at 1977.
We must categorically reject the arguments that the charge would have been "understood by a reasonable jur[or] to be no more than a segment of the regular charge given concerning the jury's use of its common sense and the inference to be drawn from the evidence" and that the charge is "no more than a jury instruction that proof of facts leads to reasonable inferences of evidence." We do agree with the attorney general's argument that the charge requires "only [an] inference that possession of the stolen property inferred that he was at the scene of the crime and participated" — we agree that the charge required an inference that from the possession flows the conclusions that the appellant was at the scene of themurder-burglary and that he participated in themurder-burglary. As such, the instructions are fatal. See also Miller v. Norvell, 775 F.2d at 1575 (wherein the court held that "[b]ecause the instructions in the present case could be interpreted to create a mandatory rebuttable presumption, the instructions are unconstitutional").
Having found that the quoted instructions were erroneous and deprived the appellant of his constitutional right to due process of law, we review the error under the harmless error standard enunciated in Chapman v. California,386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as the Supreme Court expressly permitted in Rose v. Clark, 478 U.S. 570,106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). See also Carella v.California. The Rose Court recognized that "[the Court has] repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Id. at 576, 106 S.Ct. at 3105 (quotingDelaware v. Van Arsdall, 475 U.S. 673, 681,106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). The Court cautioned, however, that although it " 'plainly ha[s] the authority' to decide whether, on the facts of a particular case, a constitutional error was harmless under the Chapman
standard, [it] 'do[es] so sparingly.' " Id. at 584,106 S.Ct. at 3109 (quoting United States v. Hasting,461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983)). It further held that an erroneous jury instruction is harmless when all the evidence adduced at trial establishes the defendant's guilt beyond a reasonable doubt, so that the reviewing court can conclude that the erroneous presumption did not contribute to the jury's verdict. Id. at 576,106 S.Ct. at 3105. We note that in Carella,491 U.S. at 267-273, 109 S.Ct. at 2421-24, four Justices issued a separate concurring opinion wherein they questioned the holding inRose v. Clark. They explained that, in applying the harmless error standard, a court must consider not only whether the evidence of guilt in the record was overwhelming but also whether the appellant received a jury trial in accordance with the procedure and standards appropriate in criminal trials.
While we question whether the instant situation should even be scrutinized under the harmless error standard, seeCarella; Rose, 478 U.S. at 578, 106 S.Ct. at 3105, we have nevertheless reviewed the entire record in the instant case to determine whether the erroneous presumption charged was under the circumstances harmless error. The majority of the evidence circumstantially pointed to some involvement by the appellant, the minimum of which was certainly his receipt of stolen property. However, the only direct evidence of the appellant's commission of the crime of murder-burglary, particularly the element of the *Page 1347 
appellant's particularized intent to kill, comes from the testimony of Jason Childers. Because we consider that Childers possibly had the natural inclination to implicate the appellant rather than his sister-in-law in the crime for which the possible punishment is death, we must weigh the impact of his testimony against his possible bias. (At the time he testified against the appellant, his sister-in-law had been indicted for the same capital offense, and she is still awaiting trial.) We cannot confidently conclude, on the entire record, that the error was harmless beyond a reasonable doubt. We cannot say that the erroneous presumption that took from the jury's consideration all the elements of the crime of murder-burglary did not contribute to the jury's verdict. Compare Rose, 478 U.S. at 579, 106 S.Ct. at 3107
(wherein the Court noted that "[a]part from the challenged malice instruction, the jury . . . was clearly instructed that it had to find respondent guilty beyond a reasonable doubt as to every element of both first- and second-degree murder"). There is no certainty that the jury did not rely on the presumption. In fact, the prosecution relied on the presumption in making its case, and the prosecutor strongly argued the presumption to the jury.[2] Accordingly, because we cannot find the erroneous instruction to have been harmless, we have no recourse but to reverse the appellant's conviction.
 IV.
The appellant claims that a violation of Brady v.Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), occurred when the prosecution refused to allow him access to the videotape made by the police at the time the victim's property and premises were turned over to the victim's children. It appears that the tape included scenes of the property and conversations by the victim's children and others at the scene. It is our opinion that this videotape should be provided to the appellant for inspection before a new trial. See Ex parte Monk, 557 So.2d 832 (Ala. 1989).
Because of the erroneous jury instruction discussed in part III above, we find it necessary to reverse the judgment and remand this case.
REVERSED AND REMANDED.
All Judges concur.
[1] We do not construe this instruction in the context of the charge of murder-robbery because the jury did not return a guilty verdict on that count.
[2] The prosecutor in his guilt-phase closing argument stated as follows:
 "The Defense lawyers get up and say the State does not put James David Beard in Mr. Pitts's house. Well, ladies and gentlemen, I say to you we do. I say to you we do. Because the Court's going to charge you that you can draw inferences from testimony.
". . . .
 "But what we have is evidence that ties this Defendant back to that crime and says to you, cries out to you, that this Defendant committed that crime. He's in possession of that gun.
". . . .
 ". . . [The defense attorneys] want you to go back into the jury room and think about something other than the fact that James David Beard is in possession of Mr. Pitts's pistol within a couple of days after his death. And, ladies and gentlemen, the law says that you can infer from that that he committed the offense."